## ROBERTSON, CHIEF, UNITED STATES FOREST SERVICE, ET AL. *v.* SEATTLE AUDUBON SOCIETY ET AL.

No. 90–1596.   Argued December 2, 1991—Decided March 25, 1992

430

THOMAS, J., delivered the opinion for a unanimous Court.

*Solicitor General Starr* argued the cause for petitioners. With him on the briefs were *Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Clifford M. Sloan, Peter R. Steenland, Jr., Martin W. Matzen,* and *Anne S. Almy.*

*Todd T. True* argued the cause for respondents. With him on the brief for respondents Seattle Audubon Society et al. were *John Bonine, Michael Axline,* and *Victor M. Sher. Phillip D. Chadsey* filed a brief for respondents Association of O & C Counties et al. *Mark C. Rutzick* filed briefs for respondents Northwest Forest Resource Council et al.*

JUSTICE THOMAS delivered the opinion of the Court.

In this case we must determine the operation of § 318 of the Department of the Interior and Related Agencies Appropriations Act, 1990.

I

This case arises out of two challenges to the Federal Government's continuing efforts to allow the harvesting and sale of timber from old-growth forests in the Pacific Northwest. These forests are home to the northern spotted owl, a bird listed as threatened under the Endangered Species Act of 1973, 16 U. S. C. § 1531 *et seq.* (1988 ed. and Supp. II), since June 1990. See 55 Fed. Reg. 26114. Harvesting the forests, say environmentalists, would kill the owls. Restrictions on harvesting, respond local timber industries, would devastate the region's economy.

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Florida et al. by *Robert A. Butterworth,* Attorney General of Florida, *Jonathan Glogau,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Richard Blumenthal* of Connecticut, *Michael E. Carpenter* of Maine, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Frankie Sue Del Papa* of Nevada, *Robert J. Del Tufo* of New Jersey, *Nicholas J. Spaeth* of North Dakota, *Lee Fisher* of Ohio, and *Dan Morales* of Texas; and for Public Citizen by *Patti A. Goldman, Alan B. Morrison,* and *David C. Vladeck.*

Petitioner Robertson is Chief of the United States Forest Service, which manages 13 national forests in Oregon and Washington known to contain the northern spotted owl. In 1988, the Service amended its regional guide to prohibit timber harvesting on certain designated areas within those forests. Respondent Seattle Audubon Society (joined by various other environmental groups) and the Washington Contract Loggers Association (joined by various other industry groups) filed separate lawsuits in the District Court for the Western District of Washington, complaining respectively that the amendment afforded the owl either too little protection, or too much. Seattle Audubon alleged violations of three federal statutes: the Migratory Bird Treaty Act (MBTA), 40 Stat. 755, ch. 128, as amended, 16 U. S. C. § 703 *et seq.* (1988 ed. and Supp. II); the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, as amended, 42 U. S. C. § 4321 *et seq.;* and the National Forest Management Act of 1976 (NFMA), 90 Stat. 2949, as amended, 16 U. S. C. § 1600 *et seq.* The District Court consolidated the actions and preliminarily enjoined 163 proposed timber sales. *Seattle Audubon Soc.* v. *Robertson,* No. 89–160 (WD Wash., Mar. 24, 1989).

Petitioner Lujan is Secretary of the Department of the Interior. The Bureau of Land Management (BLM), an agency within the Department, manages several old-growth forests in western Oregon. Between 1979 and 1983, the BLM developed timber management plans that permitted harvesting on some areas within these forests and prohibited it on others. In 1987, the BLM and the Oregon Department of Fish and Wildlife executed an agreement that expanded the areas on which harvesting was prohibited. Also in 1987, respondent Portland Audubon Society (among others) filed suit in the District Court for the District of Oregon, challenging certain proposed harvesting under four federal statutes: MBTA; NEPA; the Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2744, as amended, 43

U. S. C. § 1701 *et seq.;* and the Oregon-California Railroad Land Grant Act (OCLA), 50 Stat. 874, 43 U. S. C. § 1181a. Twice, the District Court dismissed the action. Twice before reversing (on grounds not relevant here), the Court of Appeals for the Ninth Circuit enjoined some of the challenged harvesting pending appeal. See *Portland Audubon Soc.* v. *Lujan,* 884 F. 2d 1233, 1234 (1989), cert. denied, 494 U. S. 1026 (1990); *Portland Audubon Soc.* v. *Hodel,* 866 F. 2d 302, 304, cert. denied *sub nom. Northwest Forest Resource Council* v. *Portland Audubon Soc.,* 492 U. S. 911 (1989).

In response to this ongoing litigation, Congress enacted § 318 of the Department of the Interior and Related Agencies Appropriations Act, 1990, 103 Stat. 745, popularly known as the Northwest Timber Compromise. The Compromise established a comprehensive set of rules to govern harvesting within a geographically and temporally limited domain. By its terms, it applied only to "the thirteen national forests in Oregon and Washington and [BLM] districts in western Oregon known to contain northern spotted owls." § 318(i). It expired automatically on September 30, 1990, the last day of fiscal year 1990, except that timber sales offered under § 318 were to remain subject to its terms for the duration of the applicable sales contracts. § 318(k).

The Compromise both required harvesting and expanded harvesting restrictions. Subsections (a)(1) and (a)(2) required the Forest Service and the BLM respectively to offer for sale specified quantities of timber from the affected lands before the end of fiscal year 1990. On the other hand, subsections (b)(3) and (b)(5) prohibited harvesting altogether from various designated areas within those lands, expanding the applicable administrative prohibitions and then codifying them for the remainder of the fiscal year.[1] In addition, sub-

---

[1] Subsection (b)(3) provided:

"No timber sales offered pursuant to this section from the thirteen national forests in Oregon and Washington known to contain northern spotted owls may occur within [spotted owl habitat areas (SOHA's)] identified

sections (b)(1), (b)(2), and (b)(4) specified general environmental criteria to govern the selection of harvesting sites by the Forest Service. Subsection (g)(1) provided for limited, expedited judicial review of individual timber sales offered under § 318.

This controversy centers around the first sentence of subsection (b)(6)(A), which stated in part:

> "[T]he Congress hereby determines and directs that management of areas according to subsections (b)(3) and

---

pursuant to the Final Supplement to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide—Spotted Owl and the accompanying Record of Decision issued by the Forest Service on December 8, 1988 as adjusted by this subsection:

"(A) For the Olympic Peninsula Province, which includes the Olympic National Forest, SOHA size is to be 3,200 acres;

"(B) For the Washington Cascades Province, which includes the Mt. Baker-Snoqualmie, Okanogan, Wenatchee, and Gifford-Pinchot National Forests, SOHA size is to be 2,600 acres;

"(C) For the Oregon Cascades Province, which includes the Mt. Hood, Willamette, Rogue River, Deschutes, Winema, and Umpqua National Forests, SOHA size is to be 1,875 acres;

"(D) For the Oregon Coast Range Province, which includes the Siuslaw National Forest, SOHA size is to be 2,500 acres; and

"(E) For the Klamath Mountain Province, which includes the Siskiyou National Forest, SOHA size is to be 1,250 acres.

"(F) All other standards and guidelines contained in the Chief's Record of Decision are adopted."

Subsection (b)(5) provided:

"No timber sales offered pursuant to this section on Bureau of Land Mangagement lands in western Oregon known to contain northern spotted owls shall occur within the 110 areas identified in the December 22, 1987 agreement, except sales identified in said agreement, between the Bureau of Land Management and the Oregon Department of Fish and Wildlife. Not later than thirty days after enactment of this Act, the Bureau of Land Management, after consulting with the Oregon Department of Fish and Wildlife and the United States Fish and Wildlife Service to identify high priority spotted owl area sites, shall select an additional twelve spotted owl habitat areas. No timber sales may be offered in the areas identified pursuant to this subsection during fiscal year 1990."

(b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society et al., v. F. Dale Robertson, Civil No. 89–160 and Washington Contract Loggers Assoc. et al., v. F. Dale Robertson, Civil No. 89–99 (order granting preliminary injunction) and the case Portland Audubon Society et al., v. Manuel Lujan, Jr., Civil No. 87–1160–FR."

Subsection (b)(6)(A) also declined to pass upon "the legal and factual adequacy" of the administrative documents produced by the 1988 Forest Service amendment and the 1987 BLM agreement.[2]

After § 318 was enacted, both the *Seattle Audubon* and *Portland Audubon* defendants sought dismissal, arguing that the provision had temporarily superseded all statutes on which the plaintiffs' challenges had been based. The

---

[2] In its entirety, subsection (b)(6)(A) provided:

"Without passing on the legal and factual adequacy of the Final Supplement to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide—Spotted Owl Guidelines and the accompanying Record of Decision issued by the Forest Service on December 8, 1988 or the December 22, 1987 agreement between the Bureau of Land Management and the Oregon Department of Fish and Wildlife for management of the Spotted Owl, the Congress hereby determines and directs that management of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society et al., v. F. Dale Robertson, Civil No. 89–160 and Washington Contract Loggers Assoc. et al., v. F. Dale Robertson, Civil No. 89–99 (order granting preliminary injunction) and the case Portland Audubon Society et al., v. Manuel Lujan, Jr., Civil No. 87–1160–FR. The guidelines adopted by subsections (b)(3) and (b)(5) of this section shall not be subject to judicial review by any court of the United States."

plaintiffs resisted on the ground that the first sentence of subsection (b)(6)(A), because it purported to direct the results in two pending cases, violated Article III of the Constitution. In *Seattle Audubon,* the District Court held that subsection (b)(6)(A) "can and must be read as a temporary modification of the environmental laws." *Seattle Audubon Soc.* v. *Robertson,* No. 89–160 (WD Wash., Nov. 14, 1989). Under that construction, the court upheld the provision as constitutional and therefore vacated its preliminary injunction. Nonetheless, the court retained jurisdiction to determine whether the challenged harvesting would violate § 318 (if done in fiscal year 1990) or other provisions (if done later). In *Portland Audubon,* the District Court likewise upheld subsection (b)(6)(A), but dismissed the action entirely (without prejudice to future challenges arising after fiscal year 1990). *Portland Audubon Soc.* v. *Lujan,* No. 87–1160 (Ore., Dec. 21, 1989).

The Ninth Circuit consolidated the ensuing appeals and reversed. 914 F. 2d 1311 (1990). The court held that the first sentence of § 318(b)(6)(A) "does not, by its plain language, repeal or amend the environmental laws underlying this litigation," but rather "directs the court to reach a specific result and make certain factual findings under existing law in connection with two [pending] cases." *Id.,* at 1316. Given that interpretation, the court held the provision unconstitutional under *United States* v. *Klein,* 13 Wall. 128 (1872), which it construed as prohibiting Congress from "direct[ing] . . . a particular decision in a case, without repealing or amending the law underlying the litigation." 914 F. 2d, at 1315. The Ninth Circuit distinguished this Court's decision in *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421 (1856), which it construed as permitting Congress to "*amend or repeal* any law, even for the purpose of ending pending litigation." 914 F. 2d, at 1315 (emphasis in original).

On remand, the plaintiffs renewed their original claims. In *Seattle Audubon*, the District Court enjoined under NFMA 16 timber sales offered by the Forest Service during fiscal year 1990 in order to meet its harvesting quota under § 318(a)(1). See *Seattle Audubon Soc. v. Robertson*, No. 89–160 (WD Wash., Dec. 18, 1990, and May 24, 1991). While the District Court proceedings were ongoing, the agencies jointly sought review of the Ninth Circuit's judgment that the first sentence of subsection (b)(6)(A) was unconstitutional. We granted certiorari, 501 U. S. 1249 (1991), and now reverse.[3]

## II

The first sentence of subsection (b)(6)(A) provided that "management of areas according to subsections (b)(3) and (b)(5) . . . is adequate consideration for the purpose of meeting the statutory requirements that are the basis for *[Seattle Audubon]* and *[Portland Audubon]*." The Ninth Circuit held that this language did not "amend" any previously existing "laws," but rather "direct[ed]" certain "factual findings" and "specific result[s]" under those laws. 914 F. 2d, at 1316. Petitioners interpret the provision differently. They argue that subsection (b)(6)(A) replaced the legal standards underlying the two original challenges with those set forth in subsections (b)(3) and (b)(5), without directing particular applications under either the old or the new standards. We agree.

We describe the operation of subsection (b)(6)(A) by example. The plaintiffs in both cases alleged violations of MBTA § 2, 16 U. S. C. § 703, which makes it unlawful to "kill" or "take" any "migratory bird." Before the Compromise was

---

[3] Because no timber sales offered by the BLM during fiscal year 1990 were ever enjoined, the § 318 controversy between Portland Audubon and the BLM appears moot. We decide the case, however, because there remains a live controversy between Seattle Audubon and the Forest Service over the 16 sales offered during fiscal year 1990 and still enjoined under the NFMA.

enacted, the courts adjudicating these MBTA claims were obliged to determine whether the challenged harvesting would "kill" or "take" any northern spotted owl, within the meaning of §2.[4] Subsection (b)(6)(A), however, raised the question whether the harvesting would violate different prohibitions—those described in subsections (b)(3) and (b)(5). If not, then the harvesting would constitute "management . . . according to" subsections (b)(3) and (b)(5), and would therefore be deemed to "mee[t]" MBTA §2 regardless of whether or not it would cause an otherwise prohibited killing or taking. Thus under subsection (b)(6)(A), the agencies could satisfy their MBTA obligations in either of two ways: by managing their lands so as neither to "kill" nor "take" any northern spotted owl within the meaning of §2, or by managing their lands so as not to violate the prohibitions of subsections (b)(3) and (b)(5). Subsection (b)(6)(A) operated identically as well upon all provisions of NEPA, NFMA, FLPMA, and OCLA that formed "the basis for" the original lawsuits.

We conclude that subsection (b)(6)(A) compelled changes in law, not findings or results under old law. Before subsection (b)(6)(A) was enacted, the original claims would fail only if the challenged harvesting violated none of five old provisions. Under subsection (b)(6)(A), by contrast, those same claims would fail if the harvesting violated neither of two new provisions. Its operation, we think, modified the old provisions. Moreover, we find nothing in subsection (b)(6)(A) that purported to direct any particular findings of fact or applications of law, old or new, to fact. For challenges to sales offered before or after fiscal year 1990, subsection (b)(6)(A) expressly reserved judgment upon "the legal and factual adequacy" of the administrative documents authorizing the sales. For challenges to sales offered during fiscal year 1990, subsection (g)(1) expressly provided

---

[4] The northern spotted owl is a "migratory bird" within the meaning of MBTA. See 50 CFR §10.13 (1991).

for *judicial* determination of the lawfulness of those sales. Section 318 did not instruct the courts whether any particular timber sales would violate subsections (b)(3) and (b)(5), just as the MBTA, for example, does not instruct the courts whether particular sales would "kill" or "take" any northern spotted owl. Indeed, § 318 *could not* instruct that any particular BLM timber sales were lawful under the new standards, because subsection (b)(5) incorporated by reference the harvesting prohibitions imposed by a BLM agreement not yet in existence when the Compromise was enacted. See n. 1, *supra*.

Respondents cite three textual features of subsection (b)(6)(A) in support of their conclusion that the provision failed to supply new law, but directed results under old law. First, they emphasize the imperative tone of the provision, by which Congress "determine[d] and direct[ed]" that compliance with two new provisions would constitute compliance with five old ones. Respondents argue that "Congress was directing the subsection [only] at the courts." Brief for Respondents Seattle Audubon Society et al. 34. Petitioners, for their part, construe the subsection as "a directive [only] to the Forest Service and BLM." Brief for Petitioners 30. We think that neither characterization is entirely correct. A statutory directive binds *both* the executive officials who administer the statute *and* the judges who apply it in particular cases—even if (as is usually the case) Congress fails to preface its directive with an empty phrase like "Congress . . . directs that." Here, we fail to see how inclusion of the "Congress . . . directs that" preface undermines our conclusion that what Congress directed—to agencies and courts alike—was a change in law, not specific results under old law.

Second, respondents argue that subsection (b)(6)(A) did not modify old requirements because it deemed compliance with new requirements to "mee[t]" the old requirements. We fail to appreciate the significance of this observation. Congress might have modified MBTA directly, for example,

in order to impose a new obligation of complying either with the current § 2 or with subsections (b)(3) and (b)(5). Instead, Congress enacted an entirely separate statute deeming compliance with subsections (b)(3) and (b)(5) to constitute compliance with § 2—a "modification" of the MBTA, we conclude, through operation of the canon that specific provisions qualify general ones, see, *e. g., Simpson* v. *United States*, 435 U. S. 6, 15 (1978). As explained above, each formulation would have produced an identical task for a court adjudicating the MBTA claims—determining either that the challenged harvesting did not violate § 2 as currently written or that it did not violate subsections (b)(3) and (b)(5).

Finally, respondents emphasize that subsection (b)(6)(A) explicitly made reference to pending cases identified by name and caption number. The reference to *Seattle Audubon* and *Portland Audubon*, however, served only to identify the five "statutory requirements that are the basis for" those cases—namely, pertinent provisions of MBTA, NEPA, NFMA, FLPMA, and OCLA. Subsection (b)(6)(A) named two pending cases in order to identify five statutory provisions. To the extent that subsection (b)(6)(A) affected the adjudication of the cases, it did so by effectively modifiying the provisions at issue in those cases.

In the alternative, the Ninth Circuit held that subsection (b)(6)(A) "could not" effect an implied modification of substantive law because it was embedded in an appropriations measure. See 914 F. 2d, at 1317. This reasoning contains several errors. First, although repeals by implication are especially disfavored in the appropriations context, see, *e. g., TVA* v. *Hill*, 437 U. S. 153, 190 (1978), Congress nonetheless may amend substantive law in an appropriations statute, as long as it does so clearly. See, *e. g., United States* v. *Will*, 449 U. S. 200, 222 (1980). Second, because subsection (b)(6)(A) provided *by its terms* that compliance with certain new law constituted compliance with certain old law, the intent to modify was not only clear, but express. Third,

having determined that subsection (b)(6)(A) would be unconstitutional unless it modified previously existing law, the court then became obliged to impose that "saving interpretation," 914 F. 2d, at 1317, as long as it was a "possible" one. See *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 30 (1937) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act").

We have no occasion to address any broad question of Article III jurisprudence. The Court of Appeals held that subsection (b)(6)(A) was unconstitutional under *Klein* because it directed decisions in pending cases without amending any law. Because we conclude that subsection (b)(6)(A) *did* amend applicable law, we need not consider whether this reading of *Klein* is correct. The Court of Appeals stated additionally that a statute would be constitutional under *Wheeling Bridge* if it did amend law. Respondents' *amicus* Public Citizen challenges this proposition. It contends that even a change in law, prospectively applied, would be unconstitutional if the change swept no more broadly, or little more broadly, than the range of applications at issue in the pending cases. This alternative theory was neither raised below nor squarely considered by the Court of Appeals; nor was it advanced by respondents in this Court. Accordingly, we decline to address it here. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*