# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 00-40304

THOMAS LAMAR BEAN,

Petitioner-Appellee,

versus

BUREAU OF ALCOHOL, TOBACCO
AND FIREARMS; UNITED STATES
OF AMERICA,

Respondents-Appellants.

Appeal from the United States District Court
for the Eastern District of Texas, Beaumont

June 20, 2001

Before POLITZ, DeMOSS, and STEWART, Circuit Judges.

POLITZ, Circuit Judge:

The Government appeals the trial court's finding that it had jurisdiction to review the application of Thomas Lamar Bean for relief from the federal firearm disabilities resulting from a conviction in Mexico, as well as its grant of said relief therefrom. We affirm.

## BACKGROUND

The facts of this case illustrate in caps underscored why Congress added the relief provision to the Federal Firearms Act, giving certain convicted felons an avenue to regain the right to possess a firearm. They are set forth in great detail in the trial court's opinion; we merely summarize them here.

In March 1998, Bean, a Bureau of Alcohol, Tobacco and Firearms licensed firearms dealer, was in Laredo, Texas, participating in a gun show. One evening he and three assistants decided to cross the border into Mexico for dinner. He directed his assistants to remove any firearms and ammunition from his vehicle, a Chevrolet Suburban, before crossing the border; however, a box of ammunition containing approximately 200 rounds inadvertently was left in the back. The box was in plain view and Mexican customs officers saw it when they sought to enter the Mexican Port of Entry at Nuevo Laredo, Tamaulipas, Mexico. At the time importing ammunition into Mexico was considered a felony.[1] The three assistants were subsequently released but Bean, as the owner of the Suburban and the ammunition, was charged and convicted of the felony of unlawfully importing ammunition.[2]

---

[1] Purportedly because of the publicity arising from this case the offense has been reduced to a misdemeanor.

[2] The record reflects the difficulties experienced by Bean during his arrest and initial incarceration, primarily based upon procedural issues which were compounded

Bean was incarcerated in Mexico for approximately six months before being released to the custody of the United States under the International Prisoner Transfer Treaty. He thereafter spent another month in federal prison before being released under supervision. As a convicted felon, under 18 U.S.C. § 922(g)(1) Bean lost all rights to possess firearms. Section 925(c) of the statute, however, provides a means for relief from the firearms disabilities. Upon completion of his period of supervision in July, 1999, Bean petitioned the BATF for such relief so that he might return to his business.

At issue herein is the action and inaction of Congress since 1992. For this nigh decade, Congress has stated in its annual budget appropriation bill that "none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C § 925(c)."[3] Because the BATF could not use any appropriated funds to fulfill its responsibilities under the statute, it sent Bean a notice that it would not act upon his request due to the congressional action. Bean then petitioned the district court, contending that the BATF's letter denied

---

by his unfamiliarity with the Spanish language. Bean and the trial court both refer to these difficulties as raising constitutional concerns. Our disposition of this appeal does not rely thereon.

   [3] See Treasury, Postal Service and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732 (1992). The first year Congress denied the BATF funds to investigate *any* convicted felon. Beginning in Fiscal Year 1994, and in all subsequent appropriation acts applying to the BATF, a provision was added allowing funds to be used to investigate convicted *corporate* felons. See infra note 11.

his petition and exhausted his administrative remedies.

The district court, in its detailed Memorandum Opinion, discussed the statute, congressional actions, the various circuit opinions on this issue, including our decision in United States v. McGill,[4] and determined that it did, in fact, have jurisdiction to hear Bean's appeal. In granting Bean's petition it further found that the facts of this case underscore why § 925(c) permitted not only judicial review, but judicial supplementation of the record to prevent a miscarriage of justice.

## ANALYSIS

*Jurisdiction*

In McGill we noted that Congress, through its appropriations acts, had reflected an intent to suspend the relief provided to individuals by § 925(c). As a consequence we opined that we lacked subject m atter jurisdiction. As the Government correctly notes, ordinarily an inferior court is not at liberty to disregard the mandate of a superior court.[5] But in the instance herein presented, we must examine carefully the reasons and analysis by the trial court, and our earlier decision in light of, notably, the intervening

---

[4] 74 F.3d 64 (5th Cir. 1996)(finding that federal courts have no jurisdiction to hear appeals from individuals).

[5] See e.g., Gegenheimer v. Galan, 920 F.2d 307 (5th Cir. 1991).

passage of time and its effect.

The trial court, as had the McGill panel, extensively detailed the legislative history of the relief provisions and reached a different conclusion, noting: "Ultimately, the Court recognizes that an advocate can find an abundance of legislative history to support his position."[6] We do not here parse the committee or floor commentary but, rather, examine congressional action/inaction and its continuing effect.

As noted in the trial court's opinion, Congress first amended the Federal Firearms Act in 1965 to provide the potential and mechanism for certain convicted felons to obtain relief from federal firearms disabilities by petitioning the Secretary of the Treasury. It amended the relief provision in 1986 to provide for judicial review of executive decisions in order to better ensure that relief was available for those felons whose convictions were based on technical or unintentional violations.

In large measure, as a result of newspaper editorials about the cost to taxpayers of performing the investigations necessary under the relief provision,[7] as well as a report published by the Violence Policy Center listing instances wherein convicted

---

[6] Bean v. United States, 89 F. Supp. 2d 828, 835 (E.D. Tex. 2000).

[7] See, e.g., Why Are We Rearming Felons?, Washington Post, Sept. 25, 1991, at A24 (describing the relief provision as a "loophole"); and Felon Gun Program Should Be Disabled, Chicago Sun-Times, July 1, 1992, at 31.

felons had their firearms privileges restored and committed violent crimes,[8] a senate bill entitled the Stop Arming Felons (SAFE) Act was introduced in 1992 to eliminate the relief provision.[9] That bill, however, was never reported out of the Senate Judiciary Committee.

Although it obviously has the power, Congress has not enacted legislation eliminating or amending § 925(c). Rather, both the House and Senate Appropriations Committees proposed language for the Treasury, Postal Service, and General Government Appropriations Act for Fiscal Year 1993 that precluded the BATF from

---

[8] Josh Sugarman, Putting Guns Back Into The Hands Of Felons: 100 Case Studies of Felons Granted Relief From Disability Under Federal Firearms Laws, Violence Policy Center (1992). The Center is a Washington, D.C. based gun-control advocacy group.

[9] See 138 Cong. Rec. S2674-04, S2675 (daily ed. March 3, 1992)(floor comments on S. 2304 by its co-sponsor, Sen. Lautenberg (D-N.J.)). We note with particular irony that according to Sen. Lautenberg the original relief provision was enacted specifically to rescue the Winchester Firearms Co., whose parent corporation Olin Winchester had pleaded guilty to felony counts on a kickback scheme and whose very existence was threatened by the subsequent denial of its ability to possess and sell firearms. As previously noted, beginning in 1993 Congress amended its appropriations language to *permit* the BATF to process petitions for relief made by corporations. In the case at bar we are presented with a situation that is virtually indistinguishable from that used to justify those actions, *i.e.*, absent the ability to possess and sell firearms Bean will lose his business. Bean *is* his "corporation," and the inequities of the situation are readily apparent. To the suggestion that a corporation, unlike an individual, cannot be a physical threat to use firearms to harm the public we note that the record is replete with testimony from legislators, law enforcement officers and BATF agents as to Bean's lawful character.

using any appropriated funds to investigate petitions for such relief.[10] That language was incorporated in the appropriations bill ultimately passed that year and has been included in each subsequent annual appropriations act relating to BATF funding.[11]

We observed in McGill that "Congress has the power to amend, suspend or repeal a statute by an appropriations bill, as long as it does so clearly."[12] We cited Robertson v. Seattle Audubon Soc.[13] as authority for that proposition. Robertson opined "[A]lthough repeals by implication are especially disfavored in the appropriations context . . . Congress nonetheless may amend substantive law in an

---

[10] See H.R. Rep. 102-618 (1992); S. Rep. 102-353 (1992).

[11] Treasury, Postal Service, and General Government Appropriations Act, 1994, Pub. L. No. 103-123, 107 Stat. 1226, 1228 (1993); Treasury, Postal Service, and General Government Appropriations Act, 1995, Pub. L. No. 103-329, 108 Stat. 2382,2385 (1994); Treasury, Postal Service, and General Government Appropriations Act, 1996, Pub. L. No. 104-52, 109 Stat. 468, 471 (1995); Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009-319 (1996); Treasury and General Government Appropriations Act, 1998, Pub. L. No. 105-61, 111 Stat. 1272, 1277 (1997); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681-485 (1998); Treasury and General Government Appropriations Act, 2000, Pub. L. No. 106-58, 113 Stat. 430, 434 (1999); and Treasury and General Government Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-129, (2000).

[12] McGill, 74 F.3d at 66.

[13] 503 U.S. 429 (1992).

appropriations statute, as long as it does so clearly."[14]

The "especially disfavored" language hales from the high court's opinion in Tennessee Valley Authority v. Hill, et al.,[15] wherein the Court stated that the doctrine disfavoring repeals by implication "applies with ever *greater* force when the claimed repeal rests solely on an Appropriations Act."[16] In the subsequent Will case, upon which the Robertson Court relied, it addressed Congress' failure to fund promised federal pay raises previously authorized by statute by refusing to appropriate funds for those raises in each year's Appropriation Act. In Will the Court found Congress' actions were clear and intentional, and thus effectively rescinded the authorized raise for each year.[17] That decision led to the Court's comments in Robertson, noted above, upon which the McGill panel relied.

We find the facts at bar readily distinguishable from Will, and thus distinguishable from Robertson. Will involved authorized salary increases, a purely financial right, that Congress refused to fund. When it passed the Executive Salary

---

[14] Robertson, 503 U.S. at 440 (citing United States v. Will, et al., 437 U.S. 153 (1978)).

[15] 437 U.S. 153 (1977).

[16] Id. at 190 (emphasis in original).

[17] With the exception of federal judges for two of the four years in question, where the Appropriation Act violated the Compensation Clause.

Cost-of-Living Adjustment Act [18] in 1975 Congress promised certain federal employees annual cost-of-living salary increases, based upon certain financial criteria. It then changed its mind and rescinded *that year's* increase in each of the four years beginning in 1977.[19]

In the case at bar, Congress is not merely promising money then changing its mind and not making it available. Nor is it directly suspending a statutory provision. In enacting § 925(c) Congress granted certain persons administrative and judicial rights. The SAFE Act proposed to withdraw those rights, but Congress did not adopt that withdrawal. The Government insists, however, that Congress indirectly has abrogated those rights by necessarily recognizing same but declining expenditure of any funds for their enforcement. We find that action clearly distinguishable from the facts in the cited precedential cases and inimical to our constitutional system of justice.

In its early review of this conundrum, the McGill panel relied on Robertson. In

---

[18] Pub. L. No. 94-82, 89 Stat. 419 (1975).

[19] The Supreme Court considered and rejected the contention that the authorized increase remained outstanding but unfunded, concluding that the raise itself was rescinded. Will, 449 U.S. at 224. In support of its position the Court cited United States v. Dickerson, 310 U.S. 554 (1940). Dickerson also pertained to statutorily authorized financial payments that were rescinded by an Appropriation Act, in that case the payment of an enlistment allowance for those military personnel who re-enlisted during the fiscal year. Like Will, Dickerson pertained to purely financial rights that Congress then rescinded by expressly refusing to fund same, and is distinguishable herefrom.

addition to the noted factual differences of <u>Robertson</u>, <u>Will</u>, and <u>Dickerson</u>, we have a critical additional factor, the intervening passage of time and the resulting reality of the effective non-temporary "suspension" of statutorily created rights. We must conclude that Congress seeks to abrogate administrative and judicial rights it created, by using funding bills, after declining to address actual amendments to or revocation of the creating statute. Section 925(c) was enacted for apparently valid reasons, and citizens like Bean are entitled to the rights therein created and authorized unless and until Congress determines to change same. We must now conclude that merely refusing to allow the agency responsible for facilitating those rights to use appropriated funds to do its job under the statute is not the requisite direct and definite suspension or repeal of the subject rights. We further hold that when the BATF notified Bean that it would not act on his petition, his administrative remedies <u>de facto</u> were exhausted.[20] Accordingly, the trial court had jurisdiction to entertain this appeal.

*The Merits*

The Government cites as error the trial court's grant of relief, contending without

---

[20] The BATF advised that it was not accepting petitions from individuals for restoration of rights, and told Bean he could apply "if and when Congress acts to remove the restriction currently imposed." This is not a case of mere agency delay in processing his petition, it is complete preclusion of administrative remedies for an indefinite, possibly infinite, period of time. Bean's administrative options were foreclosed, and thus exhausted for purposes of § 925(c).

citing any authority that when reviewing the actions of an administrative agency the court "stands in the shoes" of that agency and is bound by the applicable federal regulations. Here the Government contends 27 C.F.R. § 178.144(d) precludes relief where the petitioner is prohibited from possessing all types of firearms in the state in which he resides. It asserts that because Bean resides in Texas and under Texas law a convicted felon cannot possess firearms for five years after being released from confinement or supervised release,[21] it could not have granted his petition for relief in any event; therefore, the district court erred as a matter of law in doing so.

At the threshold we unqualifiedly reject the suggestion that a court stands in the shoes of an agency and is bound by *all* of its implementing regulations. Substantive federal regulations carry the force and effect of federal law; however, interpretive regulations serve merely to guide a court in applying a statute.[22] Generally, where a regulation "appears supported by the plain language of the statute and is adopted pursuant to the explicit grant of rulemaking authority," that regulation is considered as having legislative effect and accorded more than mere deference.[23] We find nothing in 27 C.F.R. § 178.144(d) that would come under such a definition. Nothing in §

---

[21] TEX. PENAL CODE ANN. § 46.04(a)(1)(Vernon 1994).

[22] Batterton v. Francis, 432 U.S. 416, 425 n.9 (1976).

[23] Atkins v. Rivera, 477 U.S. 154, 162 (1985).

925(c) authorizes the Secretary to restrict relief only to those cases where relief is available at the state level; indeed, nothing in the statute pertaining to relief even refers to the states. Section 925(c) pertains strictly to federal firearms disabilities and to relief from those federal disabilities. Absent any statutory language tying federal disabilities to state disabilities, or authorizing the Secretary to do so, we must hold that 27 C.F.R. § 178.144(d) is merely an interpretive regulation and does not bind the district court in its determination.[24] Concluding that the trial court did not err as a matter of law in granting the relief requested, we need not and do not address its determination that Bean's foreign conviction was not a predicate offense triggering the provisions of 18 U.S.C. § 922(g)(1).

## CONCLUSION

We are mindful of the serious concerns articulated about convicted felons regaining the right to possess firearms, and of the need for congressional review and enhancement of the safeguards and procedures for appropriately accomplishing this apparently worthy goal, but we are faced herein with the almost incredible plight of Thomas Bean who, at most, was negligent in not ensuring that his associates

---

[24] For similar reasons we find that the provision in § 178.144(d) stating that the Director will not *ordinarily* grant relief if the applicant has not been discharged from parole or probation for a period of at least 2 years is also interpretive, particularly in light of its qualified language.

completely performed the simple task directed, and who served months in Mexican and U.S. prisons for a simple oversight. We do not believe that any reasonable observer is persuaded that his offense creates a likelihood he represents a threat to the public's well-being, and it is beyond peradventure to believe that Congress, or those seeking to rescind § 925(c), intended for someone like Bean to lose his livelihood on the basis of the facts such as are before us. Neither equity nor the law require such an injustice.

The judgment appealed is AFFIRMED.