McKEE, Circuit Judge
concurring in the judgment:
I reluctantly concur in the judgment of the court. However, I write separately to voice my concerns over the more fundamental issue confronting us, and because I think this case is more momentous than the majority’s analysis and the weight of the aggregate.authority suggest.
I must agree that the tension between the legislative history of the appropriations ban on the Secretary’s investigation mandated under 18 U.S.C. § 925(c) requires the result that the majority reaches.[1] *232 However, I am not persuaded that Congress actually intended to repeal our subject matter jurisdiction under § 925(c). I do not doubt that “Congress wanted to suspend felons’ ability to regain their firearms privileges under § 925(c).” Maj. Op. at 230. I am not nearly as certain that Congress actually suspended those privileges as opposed to merely having created a situation that leaves the jurisdictional grant in place while making its exercise absolutely impossible. In this latter situation, courts have no alternative but to conclude that subject matter jurisdiction under § 925(c) is an impossibility and the statute therefore becomes a dead letter. There is a fine but important distinction between concluding that Congress intended to repeal a statute that confers subject matter jurisdiction, and concluding that it is impossible to exercise subject matter jurisdiction because the condition precedent to its exercise can never be satisfied although the grant of jurisdiction remains. Moreover, to the extent that the latter formulation of the issue necessarily implies the former, I write to express my concern that courts are being forced to repeal legislation that Congress has intentionally decided to leave alone.
The appropriations ban detailed by the majority is clearly in tension with the grant of subject matter jurisdiction in 18 U.S.C. § 925(c). However, I do not think that tension establishes an intent to repeal the statute. This tension may suggest that Congress intended to repeal our jurisdiction. However, as I discuss below, more than a suggestion of intent is required to imply a repeal. Moreover, to the extent that Congress may have intended an end to our jurisdiction while leaving § 925 in tact, I voice my concern that, given the separation of powers, our jurisprudential reach is exceeding our constitutional grasp.[2]
I.
At the outset, it is important to stress that repeals by implication are disfavored. See Allen v. McCurry, 449 U.S. 90, 99, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Nevertheless, as my colleagues note, an appropriations act can result in an implicit repeal of substantive law if Congress’s intent to repeal the law is clear. See Robertson v. Seattle Audubon Society, 503 U.S. 429, 440, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992); United States v. Dickerson, 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). See Maj. Op. at 219. However, courts must be even more reticent to imply a repeal of substantive legislation when the sole indi-cia of congressional intent is an appropriations act. The Supreme Court has stated:
The doctrine disfavoring repeals by implication applies with full vigor when ... the subsequent legislation is an appropriations measure. This is perhaps an understatement since it would be more accurate to say that the policy applies with even greater force when the claimed repeal rests solely on an appropriations act.
Tennessee Valley Authority v. Hill, 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (emphasis and ellipses in original, citations omitted).[3]
*233 The majority’s analysis rests in large part upon comments of individual Representatives and Senators, and statements in various committee reports. Those comments and statements evidence understandable concern and indignation over a federal agency spending money to assist convicted felons in regaining firearm privileges. Such expressions may reflect congressional intent, but that does not necessarily follow. “[Expressions of committees dealing with requests for appropriations can not be equated with statutes enacted by Congress.... ” TVA, 437 U.S. at 191, 98 S.Ct. 2279. This is particularly true when the statements are made in the appropriations context. Moreover, TVA teaches that “we should be extremely hesitant to presume the general congressional awareness [of the issues involved] based only upon a few isolated statements in the thousands of pages of legislative documents.” Id. at 192, 98 S.Ct. 2279 (quoting SEC v. Sloan, 436 U.S. 103, 121, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978) (internal quotation marks omitted)). Inasmuch as the text of § 925(c) still sets forth a mechanism whereby a convicted felon may file a request with the Secretary, I am reluctant to conclude that the “plain purpose,” of the appropriations ban was for Congress to rescind subject matter jurisdiction under that statute.
Members [of Congress] may differ sharply on the means for effectuating [their] intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the ‘plain purpose’ of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.
Bd. of Governors of Fed. Reserve Sys. v. Dimension Financial Corp., 474 U.S. 361, 374, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986).
Here, of course, the precise issue is not whether Congress thought it would be a good idea to prevent felons from regaining firearms privileges. Rather, the issue is whether Congress’s failure to appropriate funds for the investigation mandated by § 925(c) was tantamount to rescinding subject matter jurisdiction of the federal courts even though the statute conferring that jurisdiction was neither amended nor formally repealed.
The Court’s analysis in TVA counsels far more caution in resolving this paradox than is evident from the majority’s analysis. Although a strong argument can be made to distinguish the holding in TVA, I believe the analysis of the appropriations acts at issue there, is more instructive than the majority’s discussion here suggests.
TVA arose under the Endangered Species Act of 1973. That legislation authorizes the Secretary of the Interior to declare that a species is “endangered,” and thereby list it for special protection. The species at issue was the “snail darter,” a recently discovered member of the perch family. The only known snail darters lived in a portion of the Little Tennessee River that was soon to be completely inundated by the Tellico dam. That dam was nearing completion at a cost of over $100 million.
Congress had appropriated funds for the Tellico dam project every year since 1967. However, in 1972, a federal district court enjoined completion of the dam pending filing of an appropriate Environmental Impact Statement and that injunction remained in effect until late 1973 when that court approved the final Environmental Impact Statement and allowed the project to proceed. A few months after the injunction was dissolved, the snail darter was discovered in the vicinity of the Tellico project and was shortly thereafter placed *234 on the Endangered Species List. From there, this “previously unknown species of perch” took center stage in the attempt to stop construction of the dam. TVA, 437 U.S. at 159, 98 S.Ct. 2279.
In court, the Authority argued that the Endangered Species Act was not intended to prohibit the completion of a project which had been authorized and funded by Congress and was substantially constructed before the Act had even been enacted. Meanwhile, the maneuvering over the snail darter’s fate and the future of the dam had not gone unnoticed in Congress. After the Authority argued in court that Congress did not intend for the Endangered Species Act to apply in this situation, the House Committee on Appropriations went on record in a June 20, 1975 Report as recommending that an additional $29 million be appropriated for the Tellico dam project. The Report stated: “the Committee directs that the project should be completed as promptly as possible.” 437 U.S. at 164, 98 S.Ct. 2279 (emphasis in original). Consistent with that recommendation, Congress thereafter approved the Authority’s budget including funds for completing the Tellico project. That budget was signed into law one month after the snail darter was listed as an endangered species.
After the budget was enacted into law, an association of biologists and a group of concerned citizens again went into court seeking to enjoin completion of the project. This time they argued that the project violated the Endangered Species Act by endangering the last known habitat of the snail darter. Shortly thereafter, the House and Senate held appropriations hearings. Those hearings included a discussion of the Tellico budget and the controversy surrounding the project’s completion. During those hearings, the Chairman of the Authority argued that the Endangered Species Act should not apply to the Tellico dam project because it was over 50 percent completed when the Act became effective and 70 to 80 percent complete when the snail darter was listed as endangered.
Meanwhile, the district court accepted the Authority’s position in the ongoing litigation. The court refused to enjoin the project noting that a permanent injunction would mean that “some $53 million would be lost in nonrecoverable obligations, ... a large portion of the $78 million already spent would be wasted .... [and also noting that] the Endangered Species Act was passed some seven years after construction of the dam commenced and that Congress had continued appropriations for Tellico, with full awareness of the snail darter problem.” Id. at 166, 98 S.Ct. 2279. The district court reasoned that
[a]t some point in time a federal project becomes so near completion and so incapable of modification that a court of equity should not apply a statute enacted long after inception of the project to produce an unreasonable result.... Where there has been an irreversible and irretrievable commitment of resources by Congress to a project over a span of almost a decade, the Court should proceed with a great deal of circumspection.
Id. The district court also noted that the plaintiffs’ position would create the “absurd result of requiring ‘a court to halt impoundment of water behind a fully completed dam if an endangered species were discovered in the river on the day before such impoundment was scheduled to take place’ ”. Id. at 166-167, 98 S.Ct. 2279 (emphasis added). The district court “[could] not conceive that Congress intended such a resultf ]” and refused an injunction. Id.
Only a couple of weeks after the district court refused the injunction, the Senate and House Appropriations Committees *235 recommended approval of the full $9 million budget requested to continue work on the dam. The Report accompanying the legislation in the Senate stated:
During subcommittee hearings, [the Authority] was questioned about the relationship between the Tellico project’s completion and the 1975 listing of the snail darter ... as an endangered species under the Endangered Species Act.... [The Authority] repeated its view that the Endangered Species Act did not prevent the completion of the Tellico project, which has been under construction for nearly a decade. The subcommittee brought this matter, as well as the recent U.S. District Court’s decision upholdingfthe Authority’s] decision to complete the project, to the attention of the full Committee. The Committee does not view the Endangered Species Act as prohibiting completion of the Tellico project at its advanced stage and directs that this project be completed as promptly as possible in the public interest.
Id. (emphasis in original). Thereafter, both Houses of Congress passed the Authority’s budget including the requested funds for completion of the Tellico project, and that budget was signed into law.
However, the Court of Appeals for the Sixth Circuit subsequently reversed the district court’s decision denying an injunction, and remanded the litigation to the district court with instructions that it issue an injunction that would remain in effect until Congress, “by appropriate legislation, exempts Tellico from compliance with the Act or the snail darter has been deleted from the list of endangered species or its critical habitat materially redefined.” Hill v. Tennessee Valley Authority, 549 F.2d 1064, 1069 (6th Cir.1977). The district court entered a permanent injunction on remand pursuant to that direction.
Members of the Authority’s Board thereafter appeared before subcommittees of both the House and Senate Appropriations Committees and testified in support of continued appropriations for completion of the project despite that injunction. Both Appropriations Committees subsequently recommended that Congress appropriate the full amount needed to complete the Tellico dam. The House Appropriations Committee stated in its June 2, 1977 Report:
It is the Committee’s view that the Endangered Species Act was not intended to halt projects such as these in their advanced stage of completion, and [the Committee] strongly recommends that these projects not be stopped because of misuse of the Act.
TVA, 437 U.S. at 170, 98 S.Ct. 2279 (emphasis and brackets in original). The Senate Appropriations Committee took a similarly strong stand. Its Report stated:
This committee has not viewed the Endangered Species Act as preventing the completion and use of these projects which were well under way at the time the affected species were listed as endangered. If the act has such an effect which is contrary to the Committee’s understanding of the intent of Congress in enacting the Endangered Species Act, funds should be appropriated to allow these projects to be completed and their benefits realized in the public interest, the Endangered Species Act notwithstanding.
Id. at 171, 98 S.Ct. 2279 (emphasis in original). Both Houses of Congress approved the Authority’s budget, and a budget including funds to complete the Tellico project was subsequently signed into law.[4]
*236 The primary issue facing the Supreme Court on appeal from the court of appeals’ decision granting an injunction was whether Congress’s continued funding of the project under these unique circumstances implied the repeal or amendment of the Endangered Species Act as applied to the Tellico project. In resolving that question, the Court accepted the proposition that completion of the nearly completed dam would “either eradicate the known population of snail darters or destroy their ‘critical habitat.’ ” Id. at 171, 98 S.Ct. 2279. As noted above, the Court first reiterated that the doctrine disfavoring repeals by implication “applies with even greater force when the claimed repeal rests solely on an Appropriations Act.” Id. at 190, 98 S.Ct. 2279 (emphasis in original). The Court further observed that the appropriations legislation that Congress approved for the project did not specifically state that the Tellico project was to be completed “irrespective of the requirements of the Endangered Species Act.” Id. at 189, 98 S.Ct. 2279. The Court therefore expressed great reluctance to glean a congressional intent from statements in the Appropriations Committee Reports, even though those statements purported to convey the will of Congress. Id. at 191, 98 S.Ct. 2279 The Court was “urged to view the Endangered Species Act reasonably, and hence shape a remedy that accords with some modicum of common sense and public weal.” Id. at 194, 98 S.Ct. 2279 (internal quotation marks omitted). The Court refused, and responded by asking: “is that our function?” Id. The same question might well be posed here. See Bd. of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp., 474 U.S. 361, 374 n. 7, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986) (Congress can best resolve “anomalies” resulting from “[t]he process of effectuating congressional intent.”).
There are, of course, real differences between inferring congressional intent from a refusal to appropriate funds and inferring congressional intent from an affirmative appropriation of funding. See TVA, 437 U.S. at 190, 98 S.Ct. 2279. Thus, my colleagues’ attempt to distinguish TVA from the circumstances surrounding the instant inquiry has some merit. Nevertheless, I find it difficult to completely reconcile our analysis with that of the Court in TVA.
18 U.S.C. § 925(c) still provides that:
a person who is prohibited from possessing ... firearms ... may make application to the Secretary for relief from the disabilities imposed by Federal Laws with respect to the acquisition ... for possession of firearms, and the Secretary may grant such relief if it is established ... that the circumstances regarding the disability ... are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.
Accordingly, persons seeking relief from the federal firearms-disability can still petition the Secretary for relief from that disability under S 925(c). No one suggests that Congress repealed that portion of the statute. Rather, Congress has placed the applicant as well as the courts in a Catch 22 reminiscent of a Kafka novel.
Similarly, I can not as easily ignore Congress’s failure to enact the Stop Arming Felons Act (“the SAFE bill”) that was introduced in 1992, as the majority; nor am I as persuaded by the statements of various Representatives and Senators supporting the SAFE legislation as my colleagues. See Maj. Op. at 228-30. “Con *237 sidering these statements in context, ... it is evident that they represent only the personal views of these legislators.... ” TVA, 437 U.S. at 193, 98 S.Ct. 2279. My colleagues note that the defeat of the SAFE-bill and the subsequent enactment of the appropriations ban was a political compromise that allowed the appropriations ban to continue on a temporary basis with some Representatives and Senators hoping it would become permanent. See Maj. Op. at 223-24. They suggest that Bean v. ATF, 253 F.3d 234, 239 (5th Cir.2001), reh’g en banc denied, 273 F.3d 1105 (5th Cir. Aug.21, 2001) (unpublished table decision), cert. granted, , 122 S.Ct. 917, 2002 WL 75667 (Jan. 22, 2002), “overlooked the fact that the appropriations ban is a temporary, compromise version of the portion of the SAFE bill that would have permanently prevented individual felons from regaining their firearms privileges.” Maj. Op. at 229 (emphasis in original). However, that does not resolve the issue. When all is said and done, the text of § 925(c) still establishes a mechanism by which convicted felons can apply for removal of the disability, and judicial review is still woven into the text of the statute establishing that mechanism.[5]
Nor am I as comfortable with the notion that Congress can grant subject matter jurisdiction on the one hand while indefinitely suspending it on the other without altering the text of the jurisdictional statute. Congress has left the mechanism of petitioning the Secretary under § 925(c) untouched. Congress had a specific opportunity to enact legislation that would remove the contradiction between the appropriations ban and the privilege of petitioning the Secretary, but it refused to do so. Now courts are forced to read the tea leaves sprinkled about the legislative history, and divine a resolution for the irreconcilable tension remaining between the continuing grant of a substantive privilege, and the failure to fund the mechanism for its realization. I agree that, given the nature of the statutory problem, we are unable to exercise subject matter jurisdiction under § 925(c).[6]
However, I join the judgment more because of that necessity than a reasoned belief that Congress itself intended to repeal a provision while leaving it intact. Rather, I believe that Congress has left it to the courts to repeal § 925(c), and I am reminded of the Supreme Court’s inquiry in TVA: “is that our function?” TVA, 437 U.S. at 194, 98 S.Ct. 2279.
*238 I am not at all sure it is, and I find myself identifying with the circus hand that our colleague, Judge Aldisert, alluded to while dissenting in United States v. Gibbs, 813 F.2d 596, 603 (3rd Cir.1986) (Aldisert, J. dissenting). There, Judge Al-disert lamented that he “would not be the circus hand following the ... elephant around the sawdust trail.” Here, I fear that we have been handed the shovel, and invited to clean up after the elephant. I am joining my colleagues in taking up the shovel. Given the parameters of the jurisprudence so deftly set forth by the majority opinion, I do not think we have a choice. The Supreme Court has granted certiorari in Bean, and this anomaly will now finally be resolved there.

. I will refer to the "Secretary” throughout as shorthand for the Secretary of the Treasury and his/her designee under 18 U.S.C. § 925(c). See 18 U.S.C. § 921(a)(18), 27 C.F.R. § 178.144(b), (d).

. Although I have reservations about the majority's analysis, I also wish to state that I disagree with the exhaustion analysis that formed the framework of our decision in Rice v. United States, 68 F.3d 702, 706-07 (3d Cir.1995); and I am not persuaded by the analysis of the Court of Appeals for the Fifth Circuit in Bean v. ATF, 253 F.3d 234 (2001).

. For convenience, I will refer to Tennessee Valley Authority v. Hill as "TVA,” and I will refer to the Tennessee Valley Authority, the petitioner in that case, as the “Authority."

. The Authority’s budget also included funds for relocating the snail darter as that was an option that was being considered.

. In this regard, the majority’s reliance on statements in S.Rep. No. 102-353, at 20 (1992) is puzzling. There, the Senate Appropriations Committee Report states: "Under current policy, States have authority to make these determinations and the Committee believes this is properly where the responsibility ought to rest.” See Maj. Op. at 229. That remark appears to refer not to the states’ ability to exempt a convicted felon from the firearms disability by expunging his/her record, granting a pardon, or restoring his/her civil rights as is provided for under 18 U.S.C. § 921(a)(20). Rather, it suggests that the states can somehow perform the investigation called for under § 925(c). I do not understand how the Supremacy Clause would permit a state investigation to substitute for the Secretary's investigation under § 925(c) absent federal legislation to that effect.

. In a different context, agency inaction can constitute a “denial” triggering judicial review if the inaction has the same impact upon the "rights” of the applicant as no action. Cutler v. Hayes, Jr., 818 F.2d 879, 898 n. 154 (D.C.Cir.,1987). However, we then determine if the agency’s inaction is unreasonable and seriously prejudicial. Houseton v. Nimmo, 670 F.2d 1375, 1378 (9th Cir.1982). Inasmuch as the Secretary’s inaction here results solely from the appropriations ban, there is no authority to conclude that it is unreasonable.