

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-29-2002

# Pontarelli v. Bur Alcohol

Precedential or Non-Precedential:

Docket 00-1268

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Pontarelli v. Bur Alcohol" (2002). *2002 Decisions.* Paper 230.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/230

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 29, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1268

LOUIS A. PONTARELLI

v.

UNITED STATES DEPARTMENT OF THE TREASURY,
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS;
JOHN W. MAGAW, DIRECTOR, BUREAU OF
ALCOHOL, TOBACCO AND FIREARMS

Bureau of Alcohol,
Tobacco and Firearms;
John W. Magaw,

Appellants

On Appeal From the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 98-cv-05081)
District Judge: Honorable Herbert J. Hutton

Argued: November 28, 2001

Before: BECKER, Chief Judge, SLOVITER, MANSMANN,*
SCIRICA, NYGAARD, ALITO, ROTH, McKEE, RENDELL,
BARRY, AMBRO, FUENTES, and ROSENN, Circuit Jud ges

(Opinion filed: March 29, 2002)

_____

* The Honorable Carol Los Mansmann participated in the oral argument
and joined in this opinion, but died before the opinion could be filed.

STUART E. SCHIFFER
Acting Assistant Attorney General
MICHAEL L. LEVY
United States Attorney
MARK B. STERN
THOMAS M. BONDY (Argued)
United States Department of Justice
601 D Street, N.W., Room 9548
Washington, D.C. 20530
Attorneys for Appellants

IMELDA M. KOETT
Associate Chief Counsel
JOHN R. KODADEK
Office of Chief Counsel
Bureau of Alcohol, Tobacco and
 Firearms
Washington, D.C. 20226

Of Counsel

GREGORY P. LaMONACA (Argued)
223 N. Monroe Street
Media, PA 19063
Attorney for Appellee

OPINION OF THE COURT

AMBRO, Circuit Judge:

The Bureau of Alcohol, Tobacco and Firearms ("ATF "), an arm of the United States Department of the Treasury, appeals the District Court's order restoring Louis A. Pontarelli's firearms privileges. ATF asks us to reconsider our holding in Rice v. United States, 68 F.3d 702, 706-07 (3d Cir. 1995), that district courts have jurisdiction under 18 U.S.C. S 925(c) to review convicted felons' applications for restoration of their firearms privileges when ATF, pursuant to Congress's mandate, is unable to do so.

Section 925(c) allows convicted felons to apply to ATF for restoration of their firearms privileges,1 and gives district

_____

1. Federal law prohibits persons convicted of a crime punishable by a prison sentence exceeding one year from possessing, shipping,

2

courts jurisdiction to review a "denial" by ATF of a felon's application. The statute provides in pertinent part:

> A person who is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition may make application to the Secretary2 for relief from the disabilities imposed by Federal laws with respect to the acquisition, receipt, transfer, shipment, transportation, or possession of firearms, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest. Any person whose application for relief from disabilities is denied by the Secretary may file a petition with the United States district court for the district in which he resides for a judicial review of such denial.

18 U.S.C. S 925(c) (emphases added). Since 1992, Congress has provided in each ATF appropriations bill that "none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. S 925(c)."3 This

_____

transporting, or receiving firearms that have traveled in interstate commerce. 18 U.S.C. S 922(g)(1). Aside from S 925(c), a convicted felon

can regain his firearms privileges if the jurisdiction in which he was convicted expunges his conviction, pardons him, or restores his civil rights. 18 U.S.C. S 921(a)(20).

2. "[T]he Secretary" means "the Secretary of the Treasury or his delegate." 18 U.S.C. S 921(a)(18). The Secretary of the Treasury has delegated his authority to grant relief under S 925(c) to the Director of ATF. 27 C.F.R. S 178.144(b), (d). For simplicity, we refer to the Director of ATF as "ATF," and, unless otherwise indicated by the text, we use "Secretary" and "ATF " interchangeably.

3. Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732 (1992); Treasury, Postal Service, and General Government Appropriations Act, 1994, Pub. L. No. 103-123, 107 Stat. 1226, 1228 (1993); Treasury, Postal Service, and General Government Appropriations Act, 1995, Pub. L. No. 103-329,

3

appropriations ban prevents ATF from acting upon--and thus from denying--felons' S 925(c) applications.

Rice was the first circuit court opinion to address whether the appropriations ban enables felons to seek the restoration of their firearms privileges in federal court despite ATF 's inability to review their applications. Unanimous panels of six other courts of appeals subsequently rejected its conclusion that ATF 's inability to act pursuant to the appropriations ban enables district courts to review applications de novo. Mullis v. United States, 230 F.3d 215, 221 (6th Cir. 2000); McHugh v. Rubin, 220 F.3d 53, 59-60 & n.5 (2d Cir. 2000); Saccacio v. ATF, 211 F.3d 102, 104 (4th Cir. 2000); Owen v. Magaw, 122 F.3d 1350, 1353-54 (10th Cir. 1997); Burtch v. United States Dep't of Treasury, 120 F.3d 1087, 1090 (9th Cir. 1997); United States v. McGill, 74 F.3d 64, 66-68 (5th Cir. 1996). But see Bean v. ATF, 253 F.3d 234, 239 (5th Cir. 2001), reh'g en banc denied, 273 F.3d 1105 (5th Cir. Aug. 21, 2001) (unpublished table decision), cert. granted, 122 S. Ct. 917 (Jan. 22, 2002) (No. 01-704).4

Bean notwithstanding, we conclude that because the
_____

108 Stat. 2382, 2385 (1994); Treasury, Postal Service, and General Government Appropriations Act, 1996, Pub. L. No. 104-52, 109 Stat. 468, 471 (1995); Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-319 (1996); Treasury, Postal Service, and General Government Appropriations Act, 1998, Pub. L. No. 105-61, 111 Stat. 1272, 1277 (1997); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2681-485 (1998); Treasury, Postal Service, Executive Office of the President, and General Government Appropriations Act, 2000, Pub. L. No. 106-58, 113 Stat. 430, 434 (1999); Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-129 (2000); Treasury and General Government Appropriations Act, 2002, Pub. L. No. 107-67, 115 Stat. 514, 519 (2001).

4. Bean contradicted McGill but purported not to overrule it. We decline

to follow Bean because, as we explain in more detail below, it ignored the texts of S 925(c) and the appropriations ban, departed from Supreme Court precedent on when an appropriations act can change a substantive statute, and distorted the legislative history of the appropriations ban.

appropriations ban suspends ATF 's ability to issue the "denial" that S 925(c) makes a prerequisite, it effectively suspends that statute's jurisdictional grant. We therefore overrule Rice and hold that the District Court lacked subject matter jurisdiction to consider Pontarelli's application.

## I. Facts and Procedural History

Pontarelli pled guilty in 1991 to violating 18 U.S.C. S 666(a)(2) by making cash payments totaling over $1,000 to a public official in exchange for favorable treatment in the award of federally financed housing rehabilitation contracts.5 He was sentenced to three years of probation, fined, and ordered to pay $4,000 in restitution and to perform two hundred hours of community service. In 1998, Pontarelli submitted a S 925(c) application to ATF for the restoration of his firearms privileges. The agency told him that the appropriations ban rendered it unable to consider his application.

Pontarelli sued in the District Court, claiming that Rice allowed it to consider his application despite ATF 's inability to act. The Court held an evidentiary hearing to determine whether he satisfied S 925(c)'s criteria for relief. Only Pontarelli presented evidence at the hearing.6 Based on that

_____

5. Section 666(a)(2) prohibits bribing "an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more" if the organization, government, or agency receives over $10,000 in federal assistance in any one-year period.

6. Pontarelli testified that he wants to regain his firearms privileges because he fears for his safety when he inspects dwellings for code compliance and collects payments for his son's construction company, and because he worries about the safety of his home in Clifton Heights, Pennsylvania. He added that prior to his conviction he was an avid hunter and a member of a gun club. Pontarelli's wife and son, as well as a former Chief of Police of Clifton Heights (who had known him for sixteen years) and the then-current Chief of Police of Clifton Heights (who had known Pontarelli for twenty-seven years and was a member of the gun club to which he belonged before his conviction), also testified, stating that Pontarelli is not a violent person, does not abuse drugs or alcohol, and would not threaten any person or the community if his gun privileges were restored.

presentation, the Court ordered his firearms privileges restored. Pontarelli v. United States, Dep't of Treasury, No. CIV.A.98-5081, 2000 WL 274002, at *1-3 (E.D. Pa. Mar. 9, 2000). When ATF appealed, we voted after panel oral argument to hear the case en banc to reconsider Rice.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. S 1291 because ATF appeals the District Court's final judgment in Pontarelli's favor. We consider de novo whether the District Court had subject matter jurisdiction. In re Phar-Mor, Inc. Sec. Litig., 172 F.3d 270, 273 (3d Cir. 1999).

## III. Rice

In Rice, a convicted felon applied to ATF for the restoration of his firearms privileges. After ATF informed him that the appropriations ban prevented it from processing his application, Rice sought judicial review. Rice, 68 F.3d at 705-06. The District Court dismissed his suit, concluding that it lacked subject matter jurisdiction because ATF 's inability to act on his application was not a "denial" under S 925(c). Rice v. ATF , 850 F. Supp. 306, 308 (E.D. Pa. 1994) (citing Moyer v. Secretary of the Treasury, 830 F. Supp. 516, 518 (W.D. Mo. 1993)).

We reversed, holding that the District Court had jurisdiction because the appropriations ban did not convey a clear intent to repeal S 925(c) or to preclude judicial review of ATF 's inability to restore felons' firearms privileges. Rice, 68 F.3d at 706-07. We acknowledged that under Robertson v. Seattle Audubon Society, 503 U.S. 429, 440 (1992), and United States v. Dickerson, 310 U.S. 554, 555 (1940), Congress can use an appropriations act to modify substantive law if the act clearly states its intention to do so.7 We then analyzed in a single paragraph

---

7. However, we did not cite United States v. Will, in which the Supreme Court held that "when Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that . . . it could accomplish its purpose by an amendment to an appropriation bill, or otherwise,' " and that whether an appropriations measure changes substantive law " 'depends on the intention of Congress as expressed in the statutes.' " 449 U.S. 200, 222 (1980) (quoting Dickerson, 310 U.S. at 555, and United States v. Mitchell, 109 U.S. 146, 150 (1883)).

Congress's intent in enacting the appropriations ban. Rice, 68 F.3d at 707. Without considering its obvious relationship to S 925(c)'s "denial" provision, its legislative history, or the implications of allowing felons to go straight to federal court to regain their firearms privileges, we determined that the appropriations ban did not prevent district courts from reviewing ATF 's inability to restore felons' firearms privileges. Id. We reasoned that the ban did

not "expressly preclude" district courts from reviewing applications and that "more explicit language" was required to repeal either S 925(c)'s jurisdictional grant or the statute as a whole. Id.

Next we considered whether ATF 's inability to process applications excused the ordinary requirement that a person aggrieved by an agency decision exhaust his administrative remedies before seeking judicial review. Id. at 708. Relying on McCarthy v. Madigan, 503 U.S. 140, 147 (1992) (stating that "an unreasonable or indefinite timeframe for administrative action" militates against requiring exhaustion), and Coit Independence Joint Venture v. Federal Savings and Loan Insurance Corp., 489 U.S. 561, 586-87 (1989) (holding that "[t]he lack of a reasonable time limit in [an] administrative claims procedure render[ed] it inadequate" and thus excused exhaustion), we held that, because the annually reenacted appropriations ban caused an "indefinite delay" in ATF 's processing of applications, a felon could seek judicial review without exhausting his administrative remedies. Rice, 68 F.3d at 708-10. Although we recognized that the decision on whether to grant relief from firearms disabilities involves ATF 's discretion and expertise, we concluded that Congress did not intend to impose a rigid exhaustion requirement because S 925(c) gives district courts discretion to consider evidence outside the administrative record when necessary to avert a miscarriage of justice. Id. at 709.[8]

---

8. In addition, in a portion of our opinion not directly relevant here, we instructed the District Court to determine on remand whether refusing to admit Rice's proffered evidence would result in a miscarriage of justice, and if so, whether his proffered evidence, combined with the other evidence before the Court, was sufficient to satisfy Rice's burden of demonstrating that he "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Id. at 709-10 (quoting S 925(c)) (quotation marks omitted in original).

IV. The Near-Unanimous Rejection of Rice

Nearly every federal court to consider the issue after Rice rejected its conclusion that the appropriations ban allows felons to go directly to federal court to seek restoration of their firearms privileges.[9] In McGill, the first court of appeals opinion after Rice to address the issue, the Fifth Circuit stated its "doubt that the district court has original jurisdiction to consider an application to remove the Federal firearm disability," but avoided confronting the issue directly by holding that Congress intended the appropriations ban to suspend the relief provided by S 925(c). McGill, 74 F.3d at 65-66. [10] The Court relied heavily on the legislative history of the appropriations ban, which indicated that Congress suspended S 925(c)'s operation to avoid wasting resources and risking harm to innocent citizens, not to saddle federal judges with the unfamiliar

task of investigating felons' fitness to carry firearms. Id. at 66-67. Moreover, while the initial appropriations ban barred ATF from using funds to investigate any applications, in each subsequent year Congress provided funding to ATF to investigate corporations' (but not individuals') applications. This shift would not have been necessary to enable

---

9. Mullis, 230 F.3d at 221; McHugh , 220 F.3d at 59-60 & n.5; Saccacio, 211 F.3d at 104; Owen, 122 F.3d at 1353-54; Burtch, 120 F.3d at 1090; McGill, 74 F.3d at 66-68; United States v. Wiggins, 50 F. Supp. 2d 512, 514-15 (E.D. Va. 1999); Dreher v. ATF, 943 F. Supp. 680, 684 (W.D. La. 1996); see also United States v. Chavez, 204 F.3d 1305, 1314 n.6 (11th Cir. 2000) (stating in dicta that the appropriations ban suspends the relief provided by S 925(c)) (citing McGill, 74 F.3d at 66-68); Moyer, 830 F. Supp. at 518-19 (holding, in a decision issued two years before Rice but not cited therein, that district courts lack jurisdiction to consider S 925(c) applications because the appropriations ban suspended S 925(c)'s relief provision). But see Bean, 253 F.3d at 239.

10. One year after the McGill decision, the United States District Court for the Western District of Louisiana addressed the jurisdiction issue in Dreher. Relying on the McGill panel's statement in dicta that Congress intended for district courts to have jurisdiction only over applications that ATF has denied, McGill, 74 F.3d at 66, Dreher held that, because the appropriations ban prevents ATF from processing applications, district courts lack original jurisdiction to review them. Dreher, 943 F. Supp. at 684.

8

corporations to obtain relief if Congress intended for federal courts to consider felons' applications de novo . Id. at 67-68.

In contrast to McGill, the Ninth Circuit's decision in Burtch resolved the issue without examining the legislative history of the appropriations ban because S 925(c) "is clear on its face." Burtch, 120 F.3d at 1090. The Ninth Circuit held that the appropriations ban suspends S 925(c)'s jurisdictional grant because the latter makes a"denial" a jurisdictional prerequisite, and "[i]n the context of the entire statute, the word 'denial' means an adverse determination on the merits and does not include a refusal to act." Id. Similarly, the Fourth Circuit held in Saccacio that a district court lacks subject matter jurisdiction to adjudicate a felon's application in the first instance becauseS 925(c) "authorizes judicial review of only the denial of an application for relief," and ATF 's inability to act upon a felon's application is not " 'an adverse determination on the merits.' " Saccacio, 211 F.3d at 104 (quoting Burtch, 120 F.3d at 1090).11

The Tenth Circuit's decision in Owen held that the appropriations ban suspends S 925(c)'s jurisdictional grant. Owen, 122 F.3d at 1353. The Court rejected the argument that the ban "transferred the task of determining whether a felon's firearms privileges should be restored from [ATF] to the judiciary," emphasizing that S 925(c) allows only "the Secretary" to grant relief and permits judicial review only if

the Secretary denies relief. Id. at 1353-54. Further, the Court found that the legislative history cited in McGill refuted the notion that Congress intended for federal courts to evaluate felons' applications in the first instance. Id. at 1354.

In McHugh, the Second Circuit held that district courts lack jurisdiction to evaluate S 925(c) applications that ATF has not reviewed.[12] McHugh , 220 F.3d at 59-60 & n.5. The

_____

11. In Wiggins, which was decided the year before Saccacio, the United States District Court for the Eastern District of Virginia held that the appropriations ban suspended S 925(c)'s relief provision, leaving federal courts without jurisdiction to review felons' applications. Wiggins, 50 F. Supp. 2d at 514-15.

12. The applicant in McHugh was convicted of a "misdemeanor crime of domestic violence," which under S 922(g) has the same consequences for firearms privileges as a felony conviction. McHugh, 220 F.3d at 55.

Court explained that, for several reasons, S 925(c)'s text makes it "abundantly clear that Congress intended to confine the initial adjudication of S 925(c) applications to the Secretary" and did not want courts evaluating applications in the first instance. Id. at 59. First, the statute "explicitly limits the scope of district court jurisdiction" to reviewing a "denial" by ATF of a felon's application. Id. Second, S 925(c) gives only "the Secretary" the authority to receive applications and grant relief; it does not "create a freestanding opportunity for relief " that district courts may grant pursuant to their jurisdiction over federal questions or commerce regulations. Id.  Third, the statute's "standard for granting relief is worded so broadly as to connote administrative agency decisionmaking." Id. Fourth, S 925(c) prevents district courts from considering new evidence regarding an application unless failing to do so would produce a "miscarriage of justice," a constraint that indicates that only the Secretary may initially consider applications. Id.

The Second Circuit further noted that while S 925(c)'s text is clear, nothing in the appropriations ban's text or its legislative history suggests that Congress intended for the ban to "expand[ ] district court jurisdiction beyond the limits set forth in S 925(c)." Id. at 60. Instead, Congress expressed "pronounced skepticism about the ability of any adjudicative body to perform the task adequately and a desire to suspend the ability of individuals to have their firearms privileges restored." Id. To the extent that the appropriations ban precludes the "denial" thatS 925(c) makes a jurisdictional prerequisite, it is " 'irreconcilable' with, and impl[ies] the suspension of, that portion of S 925(c) which authorizes judicial review." Id. at 60 n.5 (quoting Tennessee Valley Auth. v. Hill, 437 U.S. 153, 190 (1978)).

Thus the crucial question was whether ATF 's inability to act constituted a "denial" triggering federal-court jurisdiction. Id. at 60. The Second Circuit concluded that it did not because "the word 'denial' connotes more than a mere refusal to act." Id. (citations omitted). Moreover, even if ATF acted unlawfully by refusing to act, the appropriate remedy would be a court order compelling it to act

pursuant to 5 U.S.C. S 706(1) (allowing a court to "compel agency action unlawfully withheld or unreasonably delayed"), not plenary judicial review of the felon's application. Id. at 61. Alternatively, if ATF 's refusal to act constituted a "de facto denial" that conferred jurisdiction, a district court could reverse ATF 's decision only if it were " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' " which complying with a congressional mandate surely is not. Id. (quoting 5 U.S.C. S 706(2)(A)) (citations omitted).

The Sixth Circuit held that the appropriations ban suspends S 925(c) in its entirety, thereby removing its jurisdictional grant. Mullis, 230 F.3d at 221. The Court reasoned that Congress chose to preclude the ATF"denial" that must precede federal jurisdiction under S 925(c). Id. at 219. Further, the limited scope of judicial review under 5 U.S.C. S 706 does not permit de novo review of S 925(c) applications, for the appropriations ban means that"there is no agency action for a federal court to compel or review." Id.

Practical considerations reinforced the Sixth Circuit's conclusion that Congress intended to suspend S 925(c)'s operation. Id. Unlike ATF, district courts are poorly equipped to conduct detailed investigations into felons' backgrounds and obtain information that they omitted from their applications, and adjudications based solely on the evidence presented by felons would be dangerously one-sided. Id. at 219-20. In addition, the legislative history showed that Congress enacted the appropriations ban to ensure that federal resources would not be devoted to restoring felons' firearms privileges. Id. at 220-21 & n.3.

While six circuit court opinions have rejected Rice, only one has agreed with it. Departing from the Fifth Circuit's ruling in McGill, the recent panel decision in Bean held that the appropriations ban does not suspend or repeal the rights embodied in S 925(c), and that district courts can consider S 925(c) applications when ATF is unable to do so.13

---

13. Bean did not reverse McGill because, as in the Third Circuit, one Fifth Circuit panel cannot reverse an earlier panel's decision. FDIC v.

Bean, 253 F.3d at 239. The panel insisted that it was

focusing on Congress's intent, but it failed to address that S 925(c)'s text makes a "denial" a jurisdictional prerequisite. Though Bean refused to consider committee reports or statements by members of Congress, it relied heavily on the failure of a bill entitled the Stop Arming Felons Act ("the SAFE bill"), which was introduced in 1992, and which, inter alia, would have repealed S 925(c). Id. at 237-39. The SAFE bill's demise, the panel reasoned, illustrates that "[a]lthough it obviously has the power, Congress has not enacted legislation eliminating or amending S 925(c)." Id. at 238. However, Bean neglected to mention (as we explain below) that the SAFE bill is the ancestor of the appropriations ban, and that the latter is a temporary, compromise version of the former.

In addition to relying on Congress's decision not to pass the SAFE bill, Bean claimed that Congress lacks constitutional authority to suspend S 925(c)'s relief scheme by refusing to fund it. Id. at 239 (calling the notion that Congress could do so "inimical to our constitutional system of justice"). The panel insisted that the Supreme Court's decisions in Will and Dickerson--which held that Congress can use an appropriations act to suspend substantive law14 --are distinguishable because those cases involved "purely financial rights that Congress then rescinded by expressly refusing to fund same." Id. at 239 n.19. Unlike a

_____

Abraham, 137 F.3d 264, 268 (5th Cir. 1998) (stating "the rule that one panel of this court cannot disregard, much less overrule, the decision of a prior panel"). Instead, Bean purported to distinguish McGill based on "the intervening passage of time." Bean , 253 F.3d at 234, 239. Despite the obvious conflict between Bean and McGill, the Fifth Circuit declined to rehear Bean en banc. As noted above, the Supreme Court recently granted ATF 's petition for certiorari. See supra text accompanying note 4.

14. Dickerson held that an appropriations bill that prohibited the use of funds to pay a statutorily required military re-enlistment allowance suspended the allowance for the fiscal year covered by that bill. 310 U.S. at 561. Will held that Congress intended to suspend statutorily required annual cost-of-living increases for federal judges when it passed appropriations bills banning the use of funds for those increases. 449 U.S. at 222-24.

congressional refusal to fund statutorily required cost-of-living increases or military re-enlistment allowances, Bean reasoned, the appropriations ban is not "the requisite direct and definite suspension or repeal of " the statutory right at issue. Id. at 239. The panel failed to cite a single case supporting its novel conclusion that an appropriations act cannot change a substantive law unless the law involves "purely financial rights." Nor did it mention that the Supreme Court unanimously held in Seattle Audubon, 503 U.S. at 440, that a provision in an appropriations bill changed the requirements for complying with laws regulating timber harvesting, and that this provision had

nothing to do with funding.15 After determining that the appropriations ban did not affect S 925(c)'s relief provision, Bean concluded--without analyzing the issues of judicial review of agency inaction discussed in McHugh and Mullis-- that district courts have jurisdiction to reviewS 925(c) applications because ATF 's failure to act effectively exhausts applicants' administrative remedies.16 Bean, 253 F.3d at 239 & n.20.

_____

15. While the provision at issue in Seattle Audubon did not pertain to the use or amount of appropriated funds, we know of no instance where the Supreme Court said that there is a distinction--let alone one of constitutional significance--between changing a substantive law by refusing to fund its implementation and doing so by including in an appropriations act legislation unrelated to funding.

16. The Bean panel repeatedly expressed sympathy for the felon whose application was at issue. For instance, it said that because the felon was a licensed firearms dealer prior to his conviction, it would be "inequit[able]" for him to be unable to resume his business while a corporation that sells firearms may seek relief under S 925(c). Bean, 253 F.3d at 238 n.9. However, the panel did not cite the Ninth Circuit's rejection in Burtch of a felon's contention that Congress violated the Equal Protection Clause by distinguishing between individual and corporate applicants. Burtch, 120 F.3d at 1090. Nor did it cite the Supreme Court's statement that "Congress could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm." Lewis v. United States, 445 U.S. 55, 66 (1980). It appears that the Bean panel was frustrated that Congress left S 925(c) intact but barred individual felons from taking advantage of the statute's relief provision by (seemingly perpetually) continuing the appropriations ban. See Bean, 253 F.3d at 239 (claiming that McGill did not control in light of "the intervening passage of time and the resulting reality of the effective non-temporary 'suspension' of statutorily created rights").

13

V. Discussion

Overwhelming authority suggests that Rice misunderstood Congress's intent in enacting the appropriations ban. The texts of S 925(c) and the appropriations ban, the legislative history of the latter, and district courts' inability to assess accurately which felons will misuse firearms confirm that Congress did not intend for felons to be able to apply directly to district courts for restoration of their firearms privileges.

A. The Texts of S 925(c) and the Appropriations Ban

The texts of S 925(c) and the appropriations ban demonstrate that district courts currently lack jurisdiction to consider felons' petitions for restoration of their firearms privileges. Section 925(c)'s jurisdictional grant provides: "Any person whose application for relief from disabilities is denied by the Secretary may file a petition with the United States district court for the district in which he resides for

a judicial review of such denial." 18 U.S.C. S 925(c) (emphases added). This language unambiguously makes a "denial" a jurisdictional prerequisite. McHugh, 220 F.3d at 59; Saccacio, 211 F.3d at 104; Burtch , 120 F.3d at 1090. Because the Secretary of the Treasury has delegated his authority to ATF, see supra note 2, a district court may review a felon's application for restoration of his firearms privileges only if ATF first denies it. Mullis , 230 F.3d at 219; McHugh, 220 F.3d at 59; Saccacio, 211 F.3d at 104; Owen, 122 F.3d at 1354; Burtch, 120 F.3d at 1090.

The structure of S 925(c) supports this reading. The statute grants only "the Secretary" the authority to grant relief in the first instance. McHugh, 220 F.3d at 59; Owen, 122 F.3d at 1354. Further, he may grant relief "if it is established to his satisfaction that . . . the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. S 925(c) (emphases added). That Congress gave "the Secretary" broad discretion to apply such an amorphous standard suggests that it wanted an administrative agency, not district courts, to decide whether to restore felons' firearms privileges. McHugh , 220 F.3d at 59.

14

In addition, immediately after stating that a district court can review a "denial," S 925(c) provides that a court may "admit additional evidence where failure to do so would result in a miscarriage of justice." While Rice claimed that this provision decisively supports its conclusion as to exhaustion of administrative remedies,[17] closer examination shows otherwise. To begin with, the "additional evidence" provision permits district courts only to supplement the record; it gives them no authority to create the record in the first place. As ATF points out, "that the district court may supplement the record does not change the fact that the court is expressly limited to conducting a 'judicial review' of ATF 's 'denial' " to determine whether it was arbitrary and capricious. Appellant's Opening Br. at 18. Moreover, Congress would not have limited the admission of "additional" evidence to situations in which a "miscarriage of justice" would result if it intended for district courts to evaluate felons' applications de novo.[18] McHugh, 220 F.3d at 59.

Because S 925(c) unequivocally makes a "denial" by ATF a jurisdictional prerequisite, we must consider whether ATF 's inability to act because of the appropriations ban constitutes a "denial."[19] We hold that it does not. "[T]he

_____

17. "Were it not for the express authority section 925(c) gives district courts to receive independent evidence when necessary to avoid a miscarriage of justice, we would be hesitant to excuse exhaustion where, as here, Congress has entrusted a decision to an agency under standards including one so broad as ensuring the public interest." Rice, 68 F.3d at 709.

18. For this reason, Rice was wrong to view the "additional evidence" provision as supporting its conclusion with respect to exhaustion of administrative remedies. Rice, 68 F.3d at 708.

19. Rice did not consider whether plenary judicial review of a felon's application is consistent with S 925(c)'s text. Instead, it treated the statute's "denial" provision as "a judicially waivable exhaustion requirement, rather than a jurisdictional prerequisite." Saccacio, 211 F.3d at 105 n.2. In addition to erroneously viewing the issue in terms of exhaustion rather than jurisdiction, Rice misapplied the exhaustion doctrine. Rice relied upon Coit Independence, 489 U.S. at 586-87, for the proposition that an agency's "undue delay" excuses exhaustion. Rice, 68 F.3d at 708-09. However, Coit Independence involved a situation where

15

word 'denial' means an adverse determination on the merits." Burtch, 120 F.3d at 1090; see also Saccacio, 211 F.3d at 104 (same). In contrast, an inability to grant a request is not commonly understood to constitute a "denial." See, e.g., Webster's Third New International Dictionary 602 (3d ed. 1993) (defining a "denial" as a "refusal to grant, assent to, or sanction" or a "rejection of something requested, claimed, or felt to be due") (emphases added). Through the appropriations ban, Congress has rendered ATF unable to consider felons'S 925(c) applications. ATF 's inability to grant the relief that felons seek does not constitute a "denial."20

Nor does the text of the appropriations ban create new jurisdiction for district courts to evaluate felons'S 925(c) applications absent a "denial." The appropriations ban provides: "[N]one of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C.S 925(c)." Pub. L. No. 107-67, 115 Stat. at 519. Nothing in the ban's text suggests that Congress intended to confer new jurisdiction on district courts to restore felons' firearms privileges. McHugh, 220 F.3d at 60. Moreover, in 1993 Congress inserted a sentence immediately following the appropriations ban that restored funding for ATF to investigate corporations' applications. Pub. L. No. 103-123, 107 Stat. at 1228 ("[S]uch funds shall be available to investigate and act upon applications filed by corporations

---

neither Congress nor the agency itself had imposed a reasonable deadline for agency action. 489 U.S. at 586-87. In contrast, when Congress passed the appropriations ban it expressly barred ATF from acting upon applications. ATF has no duty to act because Congress has prohibited it from acting; hence "[t]his is not [a] situation where an agency's proceedings have been tainted by unreasonable delay." Wiggins, 50 F. Supp. 2d at 516.

20. Although the appropriations ban expressly prohibits ATF from reviewing applications, some courts have imprecisely described ATF 's inability to act as a "refusal" to do so. See, e.g., McHugh, 220 F.3d at 60; Burtch, 120 F.3d at 1090. The word "refusal" implies that a choice was

made, and thus inaccurately suggests that ATF could have reviewed applications despite the appropriations ban.

for relief from Federal firearms disabilities under 18 U.S.C. S 925(c)."). This sentence (and its inclusion in each subsequent ATF appropriations act) would be superfluous if Congress believed that the appropriations ban permitted district courts to grant relief despite ATF 's inability to review applications. McGill, 74 F.3d at 67-68.

The texts of S 925(c) and the appropriations ban demonstrate convincingly that Congress did not intend for district courts to review individual felons' S 925(c) applications in the first instance.21 Ordinarily we do not examine legislative history when the relevant statutory texts are clear. Ross v. Hotel Employees and Restaurant Employees Intern. Union, 266 F.3d 236, 245 (3d Cir. 2001). However, because we viewed the pertinent texts differently in Rice, and because the Bean panel made selective use of the legislative history of the appropriations ban, it is appropriate to examine that history.22

B. The Legislative History of the Appropriations  Ban

The legislative history of the appropriations ban confirms that Congress did not intend for the appropriations ban to allow individual felons to go straight to district court to seek the restoration of their firearms privileges. As mentioned above, Congress first imposed the appropriations ban in 1992. In the reports to their respective chambers, the House and Senate Appropriations Committees explained why they were preventing ATF from

---

21. Even if a district court had jurisdiction, it could reverse ATF 's refusal to restore felons' firearms privileges only if ATF 's decision not to act was arbitrary and capricious, McHugh, 220 F.3d at 61; McGill, 74 F.3d at 66; Bagdonas v. Dep't of Treasury, 93 F.3d 422, 425 (7th Cir. 1996); Bradley v. ATF, 736 F.2d 1238, 1240 (8th Cir. 1984), which following Congress's mandate is not.

22. Our concurring colleague agrees that the appropriations ban is "irreconcilable" with S 925(c)'s jurisdictional grant, but criticizes, inter alia, our reliance on legislative history. We would reach the same result even if no Member of Congress uttered a word about his intent. That said, the legislative history confirms Congress's intent to suspend S 925(c)'s jurisdictional grant and undermines whatever slight persuasive value Bean has.

acting on felons' S 925(c) applications. These reports indicate that Congress wanted to suspend S 925(c)'s relief procedure because it was concerned that dangerous felons were regaining their firearms privileges and because it believed that the resources allocated to investigating felons'

applications would be better used to fight crime. The House Appropriations Committee noted:

> Under the relief procedure, ATF officials are required to guess whether a convicted felon . . . can be entrusted with a firearm. After ATF agents spend many hours investigating a particular applicant for relief, there is no way to know with any certainty whether the applicant is still a danger to public safety. Needless to say, it is a very difficult task. Thus, officials are now forced to make these decisions knowing that a mistake could have devastating consequences for innocent citizens.
>
> Thus, the Committee believes that the $3.75 million and the 40 man-years annually spent investigating and acting upon these applications for relief would be better utilized by ATF in fighting violent crime. Therefore, the Committee has included language which states that no appropriated funds be used to investigate or act upon applications for relief from Federal firearms disabilities.

H.R. Rep. 102-618, at 14 (1992). Similarly, the Senate Appropriations Committee stated:

> Under the relief procedure, ATF officials are required to determine whether a convicted felon, including persons convicted of violent felonies or serious drug offenses, can be entrusted with a firearm. After ATF agents spend many hours investigating a particular applicant they must determine whether or not that applicant is still a danger to public safety. This is a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made. The Committee believes that the approximately 40 man-years spent annually to investigate and act upon these investigations and applications would be better utilized to crack down on

18

> violent crime. Therefore, the Committee has included language in the bill which prohibits the use of funds for ATF to investigate and act upon applications for relief from Federal firearms disabilities. Under current policy, States have authority to make these determinations and the Committee believes this is properly where the responsibility ought to rest. The Committee expects ATF to redeploy the positions and funding presently supporting firearms disability relief to the Armed Career Criminal program.

S. Rep. 102-353, at 19-20 (1992).

At the same time, not a single Member of Congress suggested that the appropriations ban would give courts the authority to evaluate S 925(c) applications in the first instance. McHugh, 220 F.3d at 60. Instead, individual

Members echoed the Appropriations Committees' concern about restoring felons' firearms privileges. For instance, Senator Chafee said:

> Dozens of convicted felons who have had their gun rights reinstated have been rearrested on new charges, including attempted murder, robbery, and child molestation.
>
> This program [S 925(c)'s relief provision] just does not make any sense. At a time when gun violence is exacting terrible costs upon our society, it seems absolutely crystal clear to me that the government's time and money would be far better spent trying to keep guns out of the hands of convicted felons, not helping them regain access to firearms.
>
> I am pleased to note that the Appropriations Subcommittee23 has come to this same conclusion, and has stipulated in the bill that no appropriated funds may be used to investigate or act upon applications for relief from Federal firearms disabilities.

---

23. Though Senator Chafee referred to "the Appropriations Subcommittee," he probably meant "the Committee" because he made his remarks about one-and-a-half months after the Senate Appropriations Committee issued its report.

138 Cong. Rec. S13238 (1992). Likewise, Senator Lautenberg applauded the decision to suspend ATF from acting on S 925(c) applications: "Criminals granted relief have later been rearrested for crimes ranging from attempted murder to rape and kidnaping. . . . ATF agents have better things to do than conduct in-depth investigations on behalf of convicted felons. They should be out on the streets, pursuing criminals." Id. at S13241.

Nonetheless, the Bean panel claimed that Congress wanted courts to be able to restore felons' firearms privileges because it did not pass the SAFE bill, Bean, 253 F.3d at 237-39, which Senators Lautenberg and Simon introduced a few months before Congress decided to suspend ATF from acting on S 925(c) applications. 138 Cong. Rec. S2675 (1992). The SAFE bill would have eliminated S 925(c)'s relief provision for individuals and provided that corporations could not seek judicial review if ATF refused to restore their firearms privileges. Id. at S2676. In addition, it would have amended 18 U.S.C. S 921(a)(20) to provide that persons convicted of violent felonies cannot possess firearms even if the state in which they were convicted restores their civil rights. 24

For several reasons, the SAFE bill's demise does not support the result in Bean. To begin with, the Supreme Court has consistently said that the legislative history of "a proposal that does not become law" is "a particularly

dangerous ground" upon which to base an interpretation of an enacted law. Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990). The reason is that "[c]ongressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction, 'including the inference that the existing legislation already incorporated the offered change .' " Id. (quoting United States v. Wise, 370 U.S. 405, 411 (1962)) (emphasis added).

---

24. Section 921(a)(20) provides that a conviction"which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored" does not prevent a person from exercising firearms privileges unless the expungement, pardon, or restoration of civil rights expressly provides otherwise. 18 U.S.C.S 921(a)(20).

20

Moreover, the sponsors of the failed SAFE bill successfully pushed for the appropriations ban and viewed the ban's suspension of S 925(c)'s relief provision as a step toward the repeal that they sought. For instance, Senator Lautenberg said of the appropriations ban: "I am very pleased that the bill before us includes a provision based on legislation that I introduced with Senator Simon . . . . I'm hopeful that, before long, we can take the next step, and make the change permanent." 138 Cong. Rec. S13241 (1992).25 Indeed, the reasons that the House and Senate Appropriations Committees gave for imposing the appropriations ban mirror those offered by Senators Lautenberg and Simon in support of the SAFE bill. Compare 138 Cong. Rec. S2675 (1992) (statement of Sen. Lautenberg) ("Surely, someone who has demonstrated his or her willingness to commit a crime of violence should not be entrusted with highly dangerous, deadly weapons."), and id. at S2679 (statement of Sen. Simon) ("[T]axpayers are paying millions of dollars each year so that convicted felons may obtain firearms. In an age of increasing violent gun crimes, not to mention an ever widening budget deficit, that just doesn't make sense."), with S. Rep. No. 102-353 at 19 (1992) ("[Deciding which felons can safely carry firearms] is a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made."), and H.R. Rep. No. 102-618, at 14 (1992) ("[T]he Committee believes that the $3.75 million and the 40 man-years annually spent investigating and

---

25. Senators Lautenberg and Simon made similar statements when they unsuccessfully reintroduced the SAFE bill in subsequent years. 141 Cong. Rec. S10570 (1995) (statement of Sen. Lautenberg) ("Senator Simon and I have been successful over the past three years in securing language in the Treasury, Postal Service and General Government Appropriations Bill that prohibits the use of appropriated funds to implement the ATF relief procedure with respect to firearms. However, a funding ban is merely a stop-gap measure for one fiscal year. This bill would eliminate the relief procedure permanently."); 139 Cong. Rec. S10850 (1993) (statement of Sen. Simon) ("Last year, Senator Lautenberg

and I successfully included language in the Treasury, Postal and General Government appropriations bill to ensure that no money was spent by the Bureau in 1993 to rearm felons. However, a permanent ban is clearly needed.").

acting upon these applications for relief would be better utilized by ATF in fighting violent crime.").

In addition, Bean overlooked the fact that the appropriations ban is a temporary, compromise version of the portion of the SAFE bill that would have permanently prevented individual felons from regaining their firearms privileges. That Congress chose not to repeal S 925(c)'s relief provision does not mean that it did not intend to suspend it. Further, Bean neglected to mention that the SAFE bill raised federalism concerns that the appropriations ban did not, as it would have eliminated the states' ability to restore felons' firearms privileges. The Senate Appropriations Committee's report indicates that the SAFE bill failed to pass at least partially for this reason. See S. Rep. No. 102-353, at 20 (1992) ("Under current policy, States have authority to make these determinations and the Committee believes this is properly where the responsibility ought to rest.").

Moreover, the notion that Congress's failure to pass the SAFE bill illustrates that it wanted felons to be able to regain their firearms privileges is inconsistent with the legislative history of subsequent appropriations acts. In 1993, the Senate Appropriations Committee explained why it was continuing the appropriations ban in language virtually identical to that in its 1992 report; the only difference was that it noted that the appropriations ban would no longer apply to corporations. S. Rep. No. 103-106, at 20 (1993). The House Appropriations Committee reiterated the reasons for the ban in 1995:

> [T]hose who commit serious crimes forfeit many rights and those who commit felonies should not be allowed to have their right to own a firearm restored. We have learned sadly that too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms. There is no reason to spend the Government's time or taxpayer's [sic] money to restore a convicted felon's right to own a firearm.

H.R. Rep. No. 104-183, at 15 (1995).

Shortly after we decided Rice, Senator Simon strongly criticized our decision. He emphasized that Congress

wanted to suspend felons' ability to regain their firearms privileges, not to transfer to the courts the responsibility for reviewing S 925(c) applications:

This misguided decision [referring to Rice] could flood the courts with felons seeking the restoration of their gun rights, effectively shifting from ATF to the courts the burden of considering these applications. Instead of wasting taxpayer money and the time of ATF agents[,] which could be much better spent on important law enforcement efforts . . . we would now be wasting court resources and distracting the courts from consideration of serious criminal cases.

Fortunately, [McGill] found that congressional intent to prohibit any Federal relief--either through ATF or the courts--is clear. . . .

Given this conflict in the circuit courts, we should clarify our original and sustaining intention. The goal of this provision has always been to prohibit convicted felons from getting their guns back--whether through ATF or the courts. It was never our intention to shift the burden to the courts.

. . . .

. . . . It made no sense for ATF to take agents away from their important law enforcement work, and it makes even less sense for the courts, which have no experience or expertise in this area, to be burdened with this unnecessary job. Let me make this point perfectly clear: It was never our intent, nor is it now, for the courts to review a convicted felon's application for firearm privilege restoration.

142 Cong. Rec. S10320-21 (1996) (emphases added). In addition, Congress rejected some Members' efforts to undermine the appropriations ban. In 1995, the House Appropriations Committee reinstated the appropriations ban after one of its subcommittees voted to lift it. 141 Cong. Rec. S10572 (1995). The following year, Congress rejected a provision in the House version of the appropriations bill that would have supplemented district

23

courts' jurisdiction so that they could review someS 925(c) applications de novo.26

Since 1996, Congress has not indicated why it retained the appropriations ban. However, there has been no adverse congressional reaction to the holdings in McGill, Burtch, Owen, Saccacio, McHugh, and Mullis that the appropriations ban does not allow district courts to review S 925(c) applications. If Congress wanted district courts to be able to restore felons' firearms privileges, these decisions should have prompted it to give them jurisdiction to do so.

In sum, the legislative history of the appropriations ban demonstrates that Congress wanted to suspend felons' ability to regain their firearms privileges underS 925(c).

This history refutes the claim that Congress intended to give district courts jurisdiction to review ATF 's congressionally mandated inability to restore felons' firearms privileges. Mullis, 230 F.3d at 220-21.

C. Policy Considerations

District courts' institutional limitations suggest that Congress could not have intended for the appropriations ban to transfer to them the primary responsibility for determining whether to restore felons' firearm privileges. Evaluating a S 925(c) application requires a detailed

_____

26. The House version included an amendment offered by Representative Obey--who opposed denying nonviolent felons the opportunity to regain their firearms privileges--that implicitly gave district courts jurisdiction to review some felons' applications. Representative Obey's amendment provided that "the inability of [ATF] to process or act upon [S 925(c)] applications for felons convicted of a violent crime, firearms violations, or drug-related crimes shall not be subject to judicial review," 142 Cong. Rec. H7635 (1996), which suggested that ATF 's inability to act upon other criminals' applications was subject to judicial review. The Senate deleted this language, 142 Cong. Rec. S10141 (1996), and the final bill likewise did not give district courts new authority to review S 925(c) applications. H.R. Conf. Rept. No. 104-863, 142 Cong. Rec. H12007 (1996). Senators Lautenberg and Simon praised the Conference Committee for eliminating Representative Obey's amendment, which they said was inconsistent with the intent behind the appropriations ban. 142 Cong. Rec. S12164 (1996).

24

investigation of the felon's background and recent conduct. Id. at 219. An effective investigation entails interviewing a wide array of people, including the felon, his family, his friends, the persons whom he lists as character references, members of the community where he lives, his current and former employers, his coworkers, and his former parole officers. Id.; Bagdonas v. ATF, 884 F. Supp. 1194, 1199 (N.D. Ill. 1995). Unlike ATF, courts possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety. Mullis , 230 F.3d at 220; Owen, 122 F.3d at 1354; McGill, 74 F.3d at 67.

Because courts "are without the tools necessary to conduct a systematic inquiry into an applicant's background," if they reviewed applications de novo they would be forced to rely primarily--if not exclusively--on information provided by the felon. Mullis, 230 F.3d at 219. As few felons would volunteer adverse information, the inquiry would be dangerously one-sided.27  Id. at 219-20. Instead of being approved by ATF after a detailed investigation, felons' firearms privileges would be restored based on less, and less accurate, information. It is inconceivable that Congress--concerned that felons who regained their firearms privileges would commit violent crimes--would want to make the review process less

reliable. McGill, 74 F.3d at 67.

Conclusion

Section 925(c) gives district courts jurisdiction to review applications only after a "denial" by ATF. The appropriations ban renders ATF unable to deny individual felons' applications, and thus effectively suspendsS 925(c)'s

_____

27. Pontarelli's petition illustrates the problem. The District Court heard only from witnesses he handpicked. Not surprisingly, these witnesses described Pontarelli as a nonviolent, morally upright, and productive member of the community, and said that his firearms privileges should be restored. While Pontarelli may have all these attributes, many other convicted felons do not. If we reaffirmed Rice, many more felons would regain their firearms privileges by making similarly one-sided presentations.

25

jurisdictional grant. The legislative history of the appropriations ban confirms that Congress intended to prevent individual felons from regaining firearms privileges. Indeed, Congress could not have meant to confer new jurisdiction on the district courts to restore those privileges because district courts are incapable of predicting accurately which felons will misuse firearms. For these reasons, we overrule Rice and hold that the District Court lacked subject matter jurisdiction to review Pontarelli's application.

26

McKEE, Circuit Judge concurring in the judgment:

I reluctantly concur in the judgment of the court. However, I write separately to voice my concerns over the more fundamental issue confronting us, and because I think this case is more momentous than the majority's analysis and the weight of the aggregate authority suggest.

I must agree that the tension between the legislative history of the appropriations ban on the Secretary's investigation mandated under 18 U.S.C. S 925(c) requires the result that the majority reaches.1  However, I am not persuaded that Congress actually intended to repeal our subject matter jurisdiction under S 925(c). I do not doubt that "Congress wanted to suspend felons' ability to regain their firearms privileges under S 925(c)." Maj. Op. at 24. I am not nearly as certain that Congress actually suspended those privileges as opposed to merely having created a situation that leaves the jurisdictional grant in place while making its exercise absolutely impossible. In this latter situation, courts have no alternative but to conclude that subject matter jurisdiction under S 925(c) is an impossibility and the statute therefore becomes a dead letter. There is a fine but important distinction between

concluding that Congress intended to repeal a statute that confers subject matter jurisdiction, and concluding that it is impossible to exercise subject matter jurisdiction because the condition precedent to its exercise can never be satisfied although the grant of jurisdiction remains. Moreover, to the extent that the latter formulation of the issue necessarily implies the former, I write to express my concern that courts are being forced to repeal legislation that Congress has intentionally decided to leave alone.

The appropriations ban detailed by the majority is clearly in tension with the grant of subject matter jurisdiction in 18 U.S.C. S 925(c). However, I do not think that tension establishes an intent to repeal the statute. This tension may suggest that Congress intended to repeal our jurisdiction. However, as I discuss below, more than a

---

1. I will refer to the "Secretary" throughout as shorthand for the Secretary of the Treasury and his/her designee underS 18 U.S.C. S 925(c). See 18 U.S.C. S 921(a)(18), 27 C.F.R. S 178.144(b), (d).

suggestion of intent is required to imply a repeal. Moreover, to the extent that Congress may have intended an end to our jurisdiction while leaving S 925 in tact, I voice my concern that, given the separation of powers, our jurisprudential reach is exceeding our constitutional grasp.2

I.

At the outset, it is important to stress that repeals by implication are disfavored. See Allen v. McCurry , 449 U.S. 90, 99 (1980). Nevertheless, as my colleagues note, an appropriations act can result in an implicit repeal of substantive law if Congress's intent to repeal the law is clear. See Robertson v. Seattle Audubon Society, 503 U.S. 429, 440 (1992); United States v. Dickerson, 310 U.S. 554, 555 (1940). See Maj. Op. at 6. However, courts must be even more reticent to imply a repeal of substantive legislation when the sole indicia of congressional intent is an appropriations act. The Supreme Court has stated:

> The doctrine disfavoring repeals by implication applies with full vigor when . . . the subsequent legislation is an appropriations measure. This is perhaps an understatement since it would be more accurate to say that the policy applies with even greater force when the claimed repeal rests solely on an appropriations act.

Tennessee Valley Authority v. Hill, 437 U.S. 153, 190 (1978) (emphasis and ellipses in original, citations omitted).3

The majority's analysis rests in large part upon comments of individual Representatives and Senators, and statements in various committee reports. Those comments and statements evidence understandable concern and indignation over a federal agency spending money to assist

2. Although I have reservations about the majority's analysis, I also wish to state that I disagree with the exhaustion analysis that formed the framework of our decision in Rice v. United States, 68 F.3d 702, 706-07 (3d Cir. 1995); and I am not persuaded by the analysis of the Court of Appeals for the Fifth Circuit in Bean v. ATF , 253 F.3d 234 (2001).

3. For convenience, I will refer to Tennessee Valley Authority v. Hill as "TVA," and I will refer to the Tennessee Valley Authority, the petitioner in that case, as the "Authority."

convicted felons in regaining firearm privileges. Such expressions may reflect congressional intent, but that does not necessarily follow. "[E]xpressions of committees dealing with requests for appropriations can not be equated with statutes enacted by Congress. . . ." TVA, 437 U.S. at 191. This is particularly true when the statements are made in the appropriations context. Moreover, TVA teaches that "we should be extremely hesitant to presume the general congressional awareness [of the issues involved] based only upon a few isolated statements in the thousands of pages of legislative documents." Id. at 192 (quoting SEC v. Sloan, 436 U.S. 103, 121 (1978) (internal quotation marks omitted)). Inasmuch as the text of S 925(c) still sets forth a mechanism whereby a convicted felon may file a request with the Secretary, I am reluctant to conclude that the "plain purpose," of the appropriations ban was for Congress to rescind subject matter jurisdiction under that statute.

> Members [of Congress] may differ sharply on the means for effectuating [their] intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

Bd. of Governors of Fed. Reserve Sys. v. Dimension Financial Corp., 474 U.S. 361, 374 (1986).

Here, of course, the precise issue is not whether Congress thought it would be a good idea to prevent felons from regaining firearms privileges. Rather, the issue is whether Congress's failure to appropriate funds for the investigation mandated by S 925(c) was tantamount to rescinding subject matter jurisdiction of the federal courts even though the statute conferring that jurisdiction was neither amended nor formally repealed.

The Court's analysis in TVA counsels far more caution in resolving this paradox than is evident from the majority's analysis. Although a strong argument can be made to distinguish the holding in TVA, I believe the analysis of the appropriations acts at issue there, is more instructive than the majority's discussion here suggests.

TVA arose under the Endangered Species Act of 1973. That legislation authorizes the Secretary of the Interior to declare that a species is "endangered," and thereby list it for special protection. The species at issue was the"snail darter," a recently discovered member of the perch family. The only known snail darters lived in a portion of the Little Tennessee River that was soon to be completely inundated by the Tellico dam. That dam was nearing completion at a cost of over $100 million.

Congress had appropriated funds for the Tellico dam project every year since 1967. However, in 1972, a federal district court enjoined completion of the dam pending filing of an appropriate Environmental Impact Statement and that injunction remained in effect until late 1973 when that court approved the final Environmental Impact Statement and allowed the project to proceed. A few months after the injunction was dissolved, the snail darter was discovered in the vicinity of the Tellico project and was shortly thereafter placed on the Endangered Species List. From there, this "previously unknown species of perch" took center stage in the attempt to stop construction of the dam. TVA , 437 U.S. at 159.

In court, the Authority argued that the Endangered Species Act was not intended to prohibit the completion of a project which had been authorized and funded by Congress and was substantially constructed before the Act had even been enacted. Meanwhile, the maneuvering over the snail darter's fate and the future of the dam had not gone unnoticed in Congress. After the Authority argued in court that Congress did not intend for the Endangered Species Act to apply in this situation, the House Committee on Appropriations went on record in a June 20, 1975 Report as recommending that an additional $29 million be appropriated for the Tellico dam project. The Report stated: "the Committee directs that the project should be completed as promptly as possible." 437 U.S. at 164 (emphasis in original). Consistent with that recommendation, Congress thereafter approved the Authority's budget including funds for completing the Tellico project. That budget was signed into law one month after the snail darter was listed as an endangered species.

After the budget was enacted into law, an association of biologists and a group of concerned citizens again went into court seeking to enjoin completion of the project. This time they argued that the project violated the Endangered Species Act by endangering the last known habitat of the snail darter. Shortly thereafter, the House and Senate held appropriations hearings. Those hearings included a discussion of the Tellico budget and the controversy surrounding the project's completion. During those hearings, the Chairman of the Authority argued that the

Endangered Species Act should not apply to the Tellico dam project because it was over 50 percent completed when the Act became effective and 70 to 80 percent complete when the snail darter was listed as endangered.

Meanwhile, the district court accepted the Authority's position in the ongoing litigation. The court refused to enjoin the project noting that a permanent injunction would mean that "some $53 million would be lost in nonrecoverable obligations, . . . a large portion of the $78 million already spent would be wasted. . . . [and also noting that] the Endangered Species Act was passed some seven years after construction of the dam commenced and that Congress had continued appropriations for Tellico, with full awareness of the snail darter problem." Id . at 166. The district court reasoned that

> [a]t some point in time a federal project becomes so near completion and so incapable of modification that a court of equity should not apply a statute enacted long after inception of the project to produce an unreasonable result. . . . Where there has been an irreversible and irretrievable commitment of resources by Congress to a project over a span of almost a decade, the Court should proceed with a great deal of circumspection.

Id. The district court also noted that the plaintiffs' position would create the "absurd result of requiring 'a court to halt impoundment of water behind a fully completed dam if an endangered species were discovered in the river on the day before such impoundment was scheduled to take place' ". Id. at 166-167 (emphasis added). The district court "[could]

31

not conceive that Congress intended such a result[ ]" and refused an injunction. Id.

Only a couple of weeks after the district court refused the injunction, the Senate and House Appropriations Committees recommended approval of the full $9 million budget requested to continue work on the dam. The Report accompanying the legislation in the Senate stated:

> During subcommittee hearings, [the Authority] was questioned about the relationship between the Tellico project's completion and the 1975 listing of the snail darter . . . as an endangered species under the Endangered Species Act. . . . [The Authority] repeated its view that the Endangered Species Act did not prevent the completion of the Tellico project, which has been under construction for nearly a decade. The subcommittee brought this matter, as well as the recent U.S. District Court's decision upholding[the Authority's] decision to complete the project, to the attention of the full Committee. The Committee does not view the Endangered Species Act as prohibiting completion of the Tellico project at its advanced stage

and directs that this project be completed as promptly as possible in the public interest.

Id. (emphasis in original). Thereafter, both Houses of Congress passed the Authority's budget including the requested funds for completion of the Tellico project, and that budget was signed into law.

However, the Court of Appeals for the Sixth Circuit subsequently reversed the district court's decision denying an injunction, and remanded the litigation to the district court with instructions that it issue an injunction that would remain in effect until Congress, "by appropriate legislation, exempts Tellico from compliance with the Act or the snail darter has been deleted from the list of endangered species or its critical habitat materially redefined." Hill v. Tennessee Valley Authority, 549 F.2d 1064, 1069 (6th Cir. 1977). The district court entered a permanent injunction on remand pursuant to that direction.

32

Members of the Authority's Board thereafter appeared before subcommittees of both the House and Senate Appropriations Committees and testified in support of continued appropriations for completion of the project despite that injunction. Both Appropriations Committees subsequently recommended that Congress appropriate the full amount needed to complete the Tellico dam. The House Appropriations Committee stated in its June 2, 1977 Report:

It is the Committee's view that the Endangered Species Act was not intended to halt projects such as these in their advanced stage of completion, and [the Committee] strongly recommends that these projects not be stopped because of misuse of the Act.

TVA, 437 U.S. at 170 (emphasis and brackets in original). The Senate Appropriations Committee took a similarly strong stand. Its Report stated:

This committee has not viewed the Endangered Species Act as preventing the completion and use of these projects which were well under way at the time the affected species were listed as endangered. If the act has such an effect which is contrary to the Committee's understanding of the intent of Congress in enacting the Endangered Species Act, funds should be appropriated to allow these projects to be completed and their benefits realized in the public interest, the Endangered Species Act notwithstanding.

Id. at 171 (emphasis in original). Both Houses of Congress approved the Authority's budget, and a budget including funds to complete the Tellico project was subsequently signed into law.4

The primary issue facing the Supreme Court on appeal
from the court of appeals' decision granting an injunction
was whether Congress's continued funding of the project
under these unique circumstances implied the repeal or
amendment of the Endangered Species Act as applied to
the Tellico project. In resolving that question, the Court

---

4. The Authority's budget also included funds for relocating the snail
darter as that was an option that was being considered.

accepted the proposition that completion of the nearly
completed dam would "either eradicate the known
population of snail darters or destroy their 'critical
habitat.' " Id. at 171. As noted above, the Court first
reiterated that the doctrine disfavoring repeals by
implication "applies with even greater force when the
claimed repeal rests solely on an Appropriations Act." Id. at
190 (emphasis in original). The Court further observed that
the appropriations legislation that Congress approved for
the project did not specifically state that the Tellico project
was to be completed "irrespective of the requirements of the
Endangered Species Act." Id. at 189. The Court therefore
expressed great reluctance to glean a congressional intent
from statements in the Appropriations Committee Reports,
even though those statements purported to convey the will
of Congress. Id. at 191 The Court was "urged to view the
Endangered Species Act reasonably, and hence shape a
remedy that accords with some modicum of common sense
and public weal." Id. at 194 (internal quotation marks
omitted). The Court refused, and responded by asking: "is
that our function?" Id. The same question might well be
posed here. See Bd. of Governors of the Fed. Reserve Sys.
v. Dimension Financial Corp., 474 U.S. 361, 374 n.7 (1986)
(Congress can best resolve "anomalies" resulting from "[t]he
process of effectuating congressional intent.").

There are, of course, real differences between inferring
congressional intent from a refusal to appropriate funds
and inferring congressional intent from an affirmative
appropriation of funding. See TVA, 437 U.S. at 190. Thus,
my colleagues' attempt to distinguish TVA from the
circumstances surrounding the instant inquiry has some
merit. Nevertheless, I find it difficult to completely reconcile
our analysis with that of the Court in TVA.

18 U.S.C. S 925(c) still provides that:

>       a person who is prohibited from possessing . . .
>       firearms . . . may make application to the Secretary for
>       relief from the disabilities imposed by Federal Laws
>       with respect to the acquisition . . . for possession of
>       firearms, and the Secretary may grant such relief if it is
>       established . . . that the circumstances regarding the
>       disability . . . are such that the applicant will not be

likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.

Accordingly, persons seeking relief from the federal firearms-disability can still petition the Secretary for relief from that disability under S 925(c). No one suggests that Congress repealed that portion of the statute. Rather, Congress has placed the applicant as well as the courts in a Catch 22 reminiscent of a Kafka novel.

Similarly, I can not as easily ignore Congress's failure to enact the Stop Arming Felons Act ("the SAFE bill") that was introduced in 1992, as the majority; nor am I as persuaded by the statements of various Representatives and Senators supporting the SAFE legislation as my colleagues. See Maj. Op. at 21-24. "Considering these statements in context, . . . it is evident that they represent only the personal views of these legislators . . . ." TVA, 437 U.S. at 193. My colleagues note that the defeat of the SAFE-bill and the subsequent enactment of the appropriations ban was a political compromise that allowed the appropriations ban to continue on a temporary basis with some Representatives and Senators hoping it would become permanent. See Maj. Op. at 12-13. They suggest that Bean v. ATF , 253 F.3d 234, 239 (5th Cir. 2001), reh'g en banc denied, 273 F.3d 1105 (5th Cir. Aug. 21, 2001) (unpublished table decision), cert. granted, No. 01-704, 2002 WL 75667 (Jan. 22, 2002), "overlooked the fact that the appropriations ban is a temporary, compromise version of the portion of the SAFE bill that would have permanently prevented individual felons from regaining their firearms privileges." Maj. Op. at 22 (emphasis in original). However, that does not resolve the issue. When all is said and done, the text ofS 925(c) still establishes a mechanism by which convicted felons can apply for removal of the disability, and judicial review is still woven into the text of the statute establishing that mechanism.5

_____

5. In this regard, the majority's reliance on statements in S. Rep. No. 102-353, at 20 (1992) is puzzling. There, the Senate Appropriations Committee Report states: "Under current policy, States have authority to make these determinations and the Committee believes this is properly

Nor am I as comfortable with the notion that Congress can grant subject matter jurisdiction on the one hand while indefinitely suspending it on the other without altering the text of the jurisdictional statute. Congress has left the mechanism of petitioning the Secretary under S 925(c) untouched. Congress had a specific opportunity to enact legislation that would remove the contradiction between the appropriations ban and the privilege of petitioning the Secretary, but it refused to do so. Now courts are forced to read the tea leaves sprinkled about the legislative history,

and divine a resolution for the irreconcilable tension remaining between the continuing grant of a substantive privilege, and the failure to fund the mechanism for its realization. I agree that, given the nature of the statutory problem, we are unable to exercise subject matter jurisdiction under S 925(c).6

However, I join the judgment more because of that necessity than a reasoned belief that Congress itself intended to repeal a provision while leaving it intact. Rather, I believe that Congress has left it to the courts to repeal S 925(c), and I am reminded of the Supreme Court's inquiry in TVA: "is that our function?" TVA, 437 U.S. at 194.

---

where the responsibility ought to rest." See Maj. Op. at 22. That remark appears to refer not to the states' ability to exempt a convicted felon from the firearms disability by expunging his/her record, granting a pardon, or restoring his/her civil rights as is provided for under 18 U.S.C. S 921(a)(20). Rather, it suggests that the states can somehow perform the investigation called for under S 925(c). I do not understand how the Supremacy Clause would permit a state investigation to substitute for the Secretary's investigation under S 925(c) absent federal legislation to that effect.

6. In a different context, agency inaction can constitute a "denial" triggering judicial review if the inaction has the same impact upon the "rights" of the applicant as no action. Cutler v. Hayes, Jr., 818 F.2d 879, 898 n.154 (D.C. Cir.,1987). However, we then determine if the agency's inaction is unreasonable and seriously prejudicial. Houseton v. Nimmo, 670 F.2d 1375, 1378 (9th Cir. 1982). Inasmuch as the Secretary's inaction here results solely from the appropriations ban, there is no authority to conclude that it is unreasonable.

36

I am not at all sure it is, and I find myself identifying with the circus hand that our colleague, Judge Aldisert, alluded to while dissenting in United States v Gibbs, 813 F.2d 596, 603 (3rd Cir. 1986) (Aldisert, J. dissenting). There, Judge Aldisert lamented that he "would not be the circus hand following the . . . elephant around the sawdust trail." Here, I fear that we have been handed the shovel, and invited to clean up after the elephant. I am joining my colleagues in taking up the shovel. Given the parameters of the jurisprudence so deftly set forth by the majority opinion, I do not think we have a choice. The Supreme Court has granted certiorari in Bean, and this anomaly will now finally be resolved there.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

37